## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

6:03-cv-751-Orl-22JGG

JOE GLOVER, FAMILY POLICY
NETWORK, and AIRSIGN, LLC,       :
                                 :
          Plaintiffs,            :
                                 :
v.                               :
                                 :
FEDERAL AVIATION                 :
ADMINISTRATION, UNITED           :
STATES DEPARTMENT OF             :
TRANSPORTATION, and              :
TRANSPORTATION SECURITY          :
ADMINISTRATION,                  :
                                 :
          Defendants.            :

## PLAINTIFFS' COMPLAINT FOR CIVIL RIGHTS VIOLATIONS
## AND DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      This is a civil rights action challenging the constitutionality of the no-fly

zone over Walt Disney World and revocation of the waiver provision as adopted by the

Federal Aviation Administration and codified by the Congress of the United States.

Plaintiff Family Policy Network (FPN) is a charitable organization dedicated to informing

the public on important moral issues.  In pursuit of its mission, FPN, through its

President, Joe Glover, has contracted with Plaintiff Airsign, LLC to fly a banner over

Walt Disney World on June 7, 2003 for a period of one hour in an effort to reach

homosexuals attending the annual "Gay Day" celebration with its message of hope

through Jesus Christ.  Due to the above-described actions of the FAA and Congress,
however, FPN's and Mr. Glover's First Amendment rights have been infringed by this
prior restraint.  This lawsuit seeks to vindicate FPN's, Mr. Glover's and Airsign's First
Amendment rights to communicate their message over Disney World.

    2.     The no-fly zone was initially promulgated by the FAA shortly after the
September 11, 2001 terrorist attacks.  However, as initially implemented, the FAA
permitted waivers to the no-fly zone whereby banner towing groups could continue their
work after undergoing criminal background checks and other security measures.  Then, in
February of 2003, Congress codified the no-fly zones and enacted a blanket no-waiver
provision.  Although purportedly enacted for security reasons, in truth the no-fly zone
does almost nothing to further safety, but completely destroys the ability of citizens and
groups to exercise their First Amendment rights to free speech via aerial advertisers and
banner towing airplanes.

    3.     Plaintiffs seek a temporary restraining order barring Defendants from
prohibiting their fly-over on June 7, and striking the absolute bar on waivers to the no-fly
zone bar.  Plaintiffs also seek preliminary and permanent injunctive relief to prevent
Defendants from future application of this provision to their lawful expressive activities.

### JURISDICTION AND VENUE

    4.     This Court has subject matter jurisdiction over this action pursuant to 28
U.S.C. §§ 1331, 1343(4) and 1346(a)(2) inasmuch as this is a claim against an agency of
the United States and officers of the United States founded upon, and arising under, the

Constitution of the United States. This Court has jurisdiction over the request for

declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

5.    Venue is proper in this district pursuant to 28 U.S.C. §1391(b), because

the claims arose in the district.

## IDENTIFICATION OF PARTIES

6.    Plaintiff Joe Glover is a citizen of the United States, a resident of

Lynchburg, Virginia, and President of the Family Policy Network. *See* Declaration of Joe

Glover, attached hereto as Exhibit 1.

7.    Plaintiff Family Policy Network is a Virginia non-profit corporation

headquartered in Lynchburg, Virginia and organized for the purpose of, *inter alia*,

promoting traditional family values.

8.    Plaintiff Airsign, LLC is a North Carolina limited liability company

headquartered in Indian Trail, North Carolina. The principal pilot and owner of Airsign

is Harald Ibele. Airsign provides banner towing and aerial advertising services to the

general public.

9.    Defendant Federal Aviation Administration (FAA) is a division of the

United States Department of Transportation and an agency of the United States of

America. It exists under the laws of the United States and is a corporate entity capable of

suing and being sued.

10.    Defendant United States Department of Transportation is an agency of the

United States of America. It exists under the laws of the United States and is a corporate

entity capable of suing and being sued.

11.      Defendant Transportation Security Administration (TSA) is a division of the Department of Homeland Security, an agency of the United States, and is capable of suing and being sued.

## ALLEGATIONS OF FACT

12.      Plaintiff Joe Glover is a Christian, and as such possesses a firm conviction in the truth of the Holy Bible.  As such, Plaintiff believes that homosexuality is a sin, that it is a harmful and destructive lifestyle, and that Jesus Christ can free an individual from that sinful and destructive lifestyle.  *See* Exhibit 1 hereto, Declaration of Joe Glover.

13.      June 5-7, 2003 has been designated as "GayDays" at Disneyworld.  The event attracts tens of thousands of homosexuals from all across the nation.  The highlight of the weekend is the actual "Gay Day" itself, when all homosexual attendees are invited to be in the "Magic Kingdom" itself at the same time.  *See* www.gaydays.com/calendar/#.

14.      Plaintiff FPN, through its President and Chief Executive Officer Joe Glover, has entered into a contract with Plaintiff Airsign to fly over Disneyworld on June 7, 2003 towing a banner with the following message to the homosexuals gathered for "Gay Day": "JESUS CHRIST: HOPEFORHOMOSEXUALS.COM." *See* Ex. 1.

### FAA Regulations

15.      Pursuant to its authority under 14 CFR § 91.139, the FAA issued a Notice to Airmen (NOTAM) 1/3353, which imposed temporary flight restrictions on all aircraft within a three (3) nautical mile radius and three thousand (3,000) feet of any major

professional or collegiate sporting event or any other major open air assembly of people.

16.     Despite the apparent total ban on low-flying aircraft, the FAA has for some time granted waivers to allow certain flights within the restricted air space. Such waivers have in the past been granted to banner towing companies such as Plaintiff Airsign.

17.     On September 10, 2002, one day before the one-year anniversary of the September 11, 2001 terrorist attacks, the FAA issued NOTAM FDC 2/9583, which rescinded all previously granted waivers to the no-fly zones. Shortly thereafter, on September 27, 2002, the FAA issued a new notice, NOTAM FDC 2/0199, which cancelled the previous NOTAMs 2/9583 and 1/3353. Under the new restrictions, fly-overs were prohibited over "any stadium having a seating capacity of 30,000 or more in which a major league baseball, national football league, NCAA Division One Football, or major motor speedway event is occurring." Waivers were once again permitted, and many banner towing aircraft returned to the air.

18.     Although there had been no terrorist incidents under the waiver system, nevertheless on February 20, 2003, Congress imposed a total ban on waivers. In the middle of the 3000 page Omnibus Spending Bill, 108 P.L. 7, Congress inserted the following:

*SEC. 352. FAA NOTICE TO AIRMEN FDC 2/0199.*

*(a) IN GENERAL.– The Secretary of Transportation –*

*(1) shall maintain in full force and effect, for a period of*

-5-

*one year after the date of enactment of this Act, the restrictions imposed under Federal Aviation Administration Notice to Airmen FDC 2/0199 and the restrictions that had been in effect on September 26, 2002 and that were imposed under local Notices of Airmen based on or derived from Notice to Airmen FDC 1/3353;*

*(2) shall rescind immediately any waivers or exemptions from those restrictions that are in effect on the date of enactment of this Act; and*

*(3) may not grant any waivers or exemptions from those restrictions, except –*

> *(A) as authorized by air traffic control for operational or safety purposes;*

> *(B) for operational purposes of an event, stadium, or other venue, including (in the case of a sporting event) equipment or parts, transport of team members, officials of the governing body and immediate family members and guests of such teams and officials to and from the event, stadium, or other venue;*

> *(C) for broadcast coverage for any broadcast rights holder;*

> *(D) for safety and security purposes of the event, stadium, or other venue; or*

> *(E) to operate an aircraft in restricted airspace to the extent necessary to arrive at or depart from an airport using standard air traffic procedures.*

*(b) WAIVERS. – Beginning no earlier than one year after the date of enactment of this Act, the Secretary may modify or terminate such restrictions, or issue waivers or exemptions from such restrictions, if the Secretary promulgates, after public notice and an opportunity for comment, a rule setting forth the standards under which the Secretary*

-6-

*may grant a waiver or exemption.  Such standards shall provide a level of security at least equivalent to that provided by the waiver policy applied by the Secretary as of the date of enactment of this Act.*

*(c) FUNDING LIMITATION. – Unless and until the Secretary promulgates a rule in accordance with subsection (b) above, none of the funds made available in this Act or any other Act may be used to terminate or limit the restrictions described in paragraph (a)(1) above or to grant waivers of, or exemptions from, such restrictions except as provided in paragraph (a)(3) above.*

*(d) BROADCAST CONTRACTS NOT AFFECTED. – Nothing in this section shall be construed to affect contractual rights pertaining to any broadcasting agreement.*

19.     On March 6, 2003, the FAA issued NOTAM FDC 3/1862, modifying the restrictions set forth in NOTAM 2/0199.  This notice provided, in pertinent part:

*Pursuant to 14 CFR Section 99.7, special security instructions, commencing one hour before the scheduled time of the event until one hour after the end of the event, all aircraft and parachute operations are prohibited at and below 3,000 feet AGL* [above ground level] *within a three nautical mile radius of any stadium having a seating capacity of 30,000 or more people in which a Major League Baseball, National Football League, NCAA Division One football, or Major Motor Speedway event is occurring.  All previously issued waivers to FDC NOTAM 2/0199 are rescinded.*

20.     NOTAM 3/1862 continued to recognize waivers for broadcasters and the transport of guests of team members, for instance.

21.     Mr. Ibele, the pilot and owner of Airsign, applied for and received a waiver from the FAA's no-fly restrictions in approximately February, 2002.  *See* Declaration of Harald Ibele, attached hereto as Exhibit 2.  After the FCC revoked all waivers in September of 2002, Mr. Ibele, who has flown banners over Disney World before, submitted to additional background criminal checks and fingerprinting by

-7-

Defendant TSA. *Id.* In late September, once the FAA again modified its rules to allow for waivers, Mr. Ibele received a second waiver. Upon passage of the Omnibus Spending Bill, however, Mr. Ibele was grounded once more, despite having met and exceeded all security requirements. *Id.*

22.     Banner towers such as Airsign typically fly their banners at 1000 feet altitude. Imposition of the 3000 foot requirement renders their banners illegible due to the distance. *Id.* Indeed, because of the prohibition on fly-overs, aerial advertisers are losing millions of dollars in business. *Id.* Mr. Ibele and Airsign have sustained some $400,000 in lost revenues as a direct result of the imposition of the no-fly zones. *Id.*

23.     As a result of these regulations, then, broadcasters such as the major networks are routinely granted waivers permitting them to enter the no-fly zones to engage in free speech and free press activities, while Plaintiffs FPN, Mr. Glover and Airsign are prohibited from doing so.

**Disney Lobbying Efforts**

24.     For years, Walt Disney World sought unsuccessfully to obtain legislation decreeing fly-overs illegal, not because they were dangerous, but simply because they were bad for business.

25.     Shortly after Defendant Department of Transportation formed the TSA, it created a "Senior Advisor Program," whereby leaders in private industry would join the "government team" on transportation security. Walt Disney World was eager to place one of its own, Chris Billings, manager of Airport Guest Services at Disney World, on the

task force. *See* web site of Defendant TSA, www.tsa.gov/public/display?content=45.

26.     Disney also hired Mitch Rose, a top aide to Senator Ted Stevens of Alaska, Chairman of the powerful Senate Appropriations Committee. *See* Exhibit 3 attached, Sean Mussenden and Henry Pierson Curtis, *No-Fly Zones Shield Disney Resorts; Competitors Said Disney Used Terrorist Fears to Get Rid of Aerial-Ad Planes and Sightseeing Helicopters*, Orlando Sentinel Tribune, May 11, 2003, at A1.

27.     When House and Senate leaders met to finalize the Omnibus Spending Bill in February, 2003, only some sports stadiums were mentioned as sites for imposing the no-fly zones.  But after Senator Stevens and Senator Richard Shelby of Alabama insisted on including Disney World in the ban, the bill emerged with vague language covering Disney, too. *Id.*

28.     Although Senate rules require that spending bills provide only funding for federal agencies and not changes in policy, the Omnibus Spending Bill was an exception. Moreover, Congressional committees normally charged with oversight and review of homeland-security and transportation policy measures never saw the new no-fly zone provision. *Id.*

29.     Unlike the normal procedure for enacting no-fly zones, no military or security agency requested the Disney clause.

30.     The only commercial entity to be covered by a no-fly zone rule other than Disney is the Valdez terminal of the Alaska oil pipeline, which handles approximately one-fifth (1/5) of the U.S. domestic oil production. *Id.*

31.     On March 18, 2003, the FAA adopted NOTAM 3/2122, explicitly codifying the ban on Disney World fly-overs: "*Aircraft flight operations are prohibited at and below 3,000 feet AGL, within a 3 nautical mile radius of the Disney World theme park . . . .*"

32.     Richard Daley, mayor of Chicago, had sought for some time for a no-fly zone over Chicago, home of the Sears Tower.  Defendants ignored his pleas for a long time, but finally relented after persistent lobbying by Illinois legislators, and Chicago received a no-fly zone designation.  *See* Ex. 3.  However, unlike the ban on flying over Disney World, the Chicago ban was revoked only a few weeks later.  Homeland Security officials stated that unless a specific and credible threat were demonstrated the ban would not be reinstated.

33.     According to the same government officials, however, there has *never* been a specific and credible threat against Disney World.  In addition, according to Defendant TSA's web site, as of June 2, 2003, the TSA "has no credible information concerning specific targets, timing, or methods of attack."  *See* www2.faa.gov/specialnotams/Security%20Information%20Advisory.htm (June 2, 2003).

34.     Security experts have observed that the no-fly zones do not in fact serve security interests.  They note that the zones prohibit only flights below 3,000 feet and within 3 miles of the center of the park, and that a terrorist bent on destruction could penetrate the zone and reach the park within seconds, well before any defense could be successfully mounted.  *See* Ex. 3 at 2 (quoting John Pike of GlobalSecurity.org).

-10-

35.     While Walt Disney World now enjoys a ban on competing messages flown over its park, in the name of security, other major gatherings of tens of thousands of individuals remain unprotected by a no-fly zone: the Kentucky Derby; Minnesota's Mall of America; the Billy Graham Crusades; Universal Studios; SeaWorld Orlando; etc.

## ALLEGATIONS OF LAW

36.     All of the acts of Defendants, their officers, agents, servants, and employees, as
alleged herein, were conducted under color and pretense of the laws, regulations, customs, and usages of the United States of America.

37.     Defendants' actions in promulgating the no-fly zone over Walt Disney World and in refusing to consider waivers for banners to be flown over the park do not in fact serve legitimate public security purposes, but are actually intended to serve and do serve Disney's private economic interests.

38.     Defendants' actions in promulgating the no-fly zone over Walt Disney World and in refusing to consider waivers have caused and continue to cause Plaintiffs Joe Glover and Family Policy Network  irreparable injury to their constitutional rights.

39.     Defendants' actions in promulgating the no-fly zone over Walt Disney World and in refusing to consider waivers for legitimate banners such as the one sought to be used by Plaintiffs constitute a prior restraint on speech.

## FIRST CAUSE OF ACTION
### (First Amendment Free Speech)

40.    Paragraphs 1-39 above are incorporated herein by reference, the same as though pleaded in full.

41.    The imposition of the no-fly zone over Walt Disney World and refusal to consider a waiver is an unconstitutional abridgement of the Plaintiffs' affirmative rights to freedom of speech as secured by the First Amendment to the United States Constitution.

42.    The total ban on free speech over Walt Disney World is not narrowly tailored to serve any substantial government interest in security, as demonstrated by the successful use of waivers over the approximately 16 month period between September 2001 and February 2003, before imposition of the total ban.

43.    The total ban on free speech over Walt Disney World does not allow ample alternative avenues of communication, but rather imposes a blanket prohibition on speech.

44.    The total ban on free speech over Walt Disney World is not a reasonable time, place and manner restriction, but instead applies at all times and entirely prevents Plaintiffs from expressing their message to their intended audience.

WHEREFORE, Plaintiffs pray for relief against Defendants as hereinafter set forth.

## SECOND CAUSE OF ACTION
### (Free Speech -- Prior Restraint)

45.     Paragraphs 1-39 above are incorporated herein by reference, the same as though pleaded in full.

46.     The total ban on free speech over Walt Disney World is a prior restraint on speech, is not narrowly tailored, does not serve a significant governmental interest, and does not leave open ample alternatives for communication.

WHEREFORE, Plaintiffs pray for relief against Defendants as hereinafter set forth.

## THIRD CAUSE OF ACTION
### (Equal Protection)

47.     Paragraphs 1-39 above are incorporated herein by reference, the same as though pleaded in full.

48.     Plaintiffs Joe Glover and FPN are similarly situated to broadcasters such as the major television networks with respect to their desire to exercise their free speech and free press rights inside the no-fly zones imposed by Defendants.

49.     Defendants' imposition of the no-fly zone over Walt Disney World, their abolition of the waiver option for individuals such as Plaintiffs Joe Glover and FPN, and their allowance of waivers for the likes of the major television networks, constitute an unconstitutional abridgement of Plaintiffs' rights to equal protection of the law as secured by the Due Process clause of the Fifth Amendment to the United States Constitution.

-13-

WHEREFORE, Plaintiffs pray for relief against Defendants as hereinafter set forth.

## PRAYER FOR RELIEF

Plaintiffs respectfully pray that the Court:

a.    Assume jurisdiction over this action;

b.    Declare that Defendants' imposition of the no-fly zone over Walt Disney World, without any possibility of a waiver, is an unconstitutional violation of the First Amendment to the Constitution of the United States;

c.    Enter a Temporary Restraining Order prohibiting Defendants from imposing a total ban on free speech via the no-fly zone over Walt Disney World;

d.    Enter preliminary and permanent injunctive relief enjoining Defendants from prohibiting all speech within the no-fly zone over Walt Disney World; and

e.    Grant such other and further relief as this court deems necessary and proper.

-14-

Respectfully submitted,


Stephen M. Crampton, Trial Counsel
MS Bar No. 9952
(Pending admission Pro Hac Vice)
Brian Fahling, WA Bar No. 18894
(Pending admission Pro Hac Vice)
AMERICAN FAMILY ASSOCIATION
CENTER FOR LAW & POLICY
P.O. Drawer 2440/100 Parkgate
Tupelo, MS  38803
(662) 680-3886

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was furnished via facsimile to the following counsel for Defendants:

>Roberto Rodriguez, Esq.
>Assistant United States Attorney
>Middle District of Florida
>80 N. Hughey Avenue
>Orlando, FL 32801
>(407) 648-7500
>Fax: (407) 648-07643

and via e-mail to the following counsel:

>Brian Kennedy, Esq.
>Assistant United States Attorney General
>U.S. Department of Justice
>
>Washington, D.C.
>brian.kennedy@usdoj.gov

on this the 3rd day of June, 2003.

Stephen M. Crampton

RECYCLED PAPER
RECYCLABLE

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

JOE GLOVER, FAMILY POLICY       :
NETWORK, and AIRSIGN, LLC,       :
                                 :
        Plaintiffs,              :
                                 :
                                 :
v.                               :
                                 :
FEDERAL AVIATION                 :
ADMINISTRATION, UNITED           :
STATES DEPARTMENT OF             :
TRANSPORTATION, and              :
TRANSPORTATION SECURITY :
ADMINISTRATION,                  :
                                 :
        Defendants.              :

## DECLARATION OF JOE GLOVER

Joe Glover, upon his oath and affirmation, hereby deposes and says:

1.      I am over the age of eighteen (18) years, and competent to make this statement.  I

make this declaration upon my own personal knowledge of the facts.

2.      I am a citizen of the United States, and a resident of Lynchburg, Virginia.

3.      I am President of Family Policy Network, a conservative non-profit organization

headquartered in Virginia, and organized for the purpose of, *inter alia*, promoting traditional

family values.

4.      On or about May 30, 2003, I contracted with Airsign LLC for the towing of a

banner over and about Walt Disney World in Orlando, Florida.  The banner, which states

"JESUS CHRIST: HOPE FOR HOMOSEXUALS. COM," is to be aerially displayed on June 7,

2003 for a period of one (1) hour.

5.      Since 1991, "Gay Days" has been celebrated at Walt Disney World every year



during the month of June.  This year, "Gay Days" is scheduled for June 5-8, 2003.

6.     It is estimated that approximately 135,000 homosexuals will attend the "Gay Days" event.

7.     In 2001, Family Policy Network contracted with an aerial advertiser for the towing of the same banner at the same location it seeks to display this year.  In 2001, the banner was displayed without incident.

8.     Family Policy Network cannot reach its intended audience except through an aerial banner.  Family Policy Network has limited financial resources, and the aerial display is extremely cost-effective.  Also, it is not feasible to assemble a group of supporters large enough to handbill 135,000 people.  Finally, "Gay Days" is one of the largest gatherings of homosexuals in one place of which I am aware.  Family Policy Network will not have another opportunity to broadcast its message to a target audience of this size on the East Coast this year.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this __3rd__ day of June, 2003.

JOE GLOVER

RECYCLED PAPER
RECYCLABLE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

JOE GLOVER, FAMILY POLICY        :
NETWORK, and AIRSIGN, LLC,        :
                               :
       Plaintiffs,             :
                               :
v.                                   :
                               :
FEDERAL AVIATION            :
ADMINISTRATION, UNITED     :
STATES DEPARTMENT OF       :
TRANSPORTATION, and        :
TRANSPORTATION SECURITY    :
ADMINISTRATION,           :
                               :
       Defendants.           :

---

## DECLARATION OF HARALD IBELE

---

Harald Ibele, upon his oath and affirmation, hereby deposes and says:

1.     I am over the age of eighteen (18) years, and competent to make this statement. I make this declaration upon my own personal knowledge of the facts.

2.     I am a pilot duly licensed with the Federal Aviation Administration ("FAA").

3.     I am the principal pilot and owner of Airsign, LLC, a North Carolina limited liability company headquartered in Indian Trail, North Carolina. Airsign provides banner towing and aerial advertising services to the general public.

4.     AirSign is a member of the U.S. Aerial Advertisers Association located in Tampa, Florida, and the Outdoor Advertising Association of America, located in Washington, D.C.



RECYCLED PAPER
RECYCABLE

LexisNexis™ *Total Research System*    Practice Area Pages · · Change Client   Options   Feedback   Sign Off   He

Search ▶   Search Advisor ▶ :  Get a Document ▶   Shepard's ®   Check a Citation ▶        ECLIPSE™   History ⚲

View: Cite | KWIC | **Full** | Custom    ◄ 3 of 4 ►    **FAST PRINT**    Print | Download | Fax | Email | Text Only
                    FOCUS™ | Save As ECLIPSE | More Like This | More Like Selected Text

                                                                        Pages:     9

Source:  News & Business > News > Major Newspapers ⓘ
Terms:   **mussenden and disney and date geq (05/03/2003)**  (Edit Search)

    ↵ Select for FOCUS™ or Delivery

*Orlando Sentinel Tribune, May 11, 2003*

Copyright 2003 Sentinel Communications Co.
Orlando Sentinel (Florida)

**May** 11, 2003 Sunday, FINAL

**SECTION:** A SECTION; Pg. A1

**LENGTH:** 2622 words

**HEADLINE:** NO-FLY ZONES SHIELD **DISNEY'S** RESORTS;
COMPETITORS SAID **DISNEY** USED TERRORIST FEARS TO GET RID OF AERIAL-AD PLANES
AND SIGHTSEEING HELICOPTERS.

**BYLINE:** Sean **Mussenden** and Henry Pierson Curtis, Sentinel Staff Writers

**BODY:**
Walt **Disney** Co. won a rare prize on the eve of the Iraq war when federal officials
permanently closed the airspace above its theme parks in Florida and California -- ostensibly
to protect against terrorist attacks.

Walt **Disney** World and Disneyland now have 24-hour security zones that put them on par
with a select few potential targets in the United States, including President Bush's Texas
ranch, nuclear submarine bases and stockpiles of sarin gas and other weapons of mass
destruction.

Without public debate or even a request from the new Homeland Security Department,
Congress bent its own rules to help **Disney** secure the no-fly zones at the urging of at least
one well-connected company lobbyist.

The decision has angered pilots across the country who accuse **Disney** of manipulating the
nation's terrorism fears for one clear commercial aim: to close public airspace over its parks
as a way to ban competitors' aerial advertising planes and sightseeing helicopters.

"**Disney** tried to make that restricted airspace for years but couldn't until now because the
airspace belongs to the people, not to a corporation," said Joe Kittinger, a retired Air Force
colonel and longtime Orlando aerial advertiser. "They've achieved it now under the guise of
national security, and there is absolutely no reason for it."

**Disney** officials insist they did nothing wrong in persuading lawmakers to order the Federal
Aviation Administration to give the entertainment giant special protection for the foreseeable
future.

EXHIBIT
3

"The sole and exclusive motivation for seeking these restrictions is for the safety and enjoyment of our guests," said **Disney** spokeswoman Leslie Goodman, explaining that "enjoyment" meant everything from keeping out "banner ads from trial lawyers" to pilots "buzzing the parks."

But congressional sources familiar with **Disney's** lobbying effort say the company discussed only security concerns, leaving critics to question whether the company was honest in its dealings.

"**Disney** park officials have wanted to eliminate air traffic over the parks long before 9-11," said Phil Boyer, president of the 390,000 members of the Aircraft Owners and Pilots Association, a group asking the FAA to toss out **Disney's** no-fly zones. "Did they employ lobbyists to convince FAA to finally 'ban' general aviation in the guise of security?"

Security experts say such no-fly zones -- barring planes from flying below 3,000 feet within 3 miles of the center of the parks -- provide little actual protection from terrorism. The job of enforcing the zones is especially difficult above places such as Disneyland and Walt **Disney** World, where Cinderella Castle is located near busy airports, they say.

A terrorist in a small plane, for example, could fly from outside the zone and reach a park within seconds, they point out.

"Apart from warning away law-abiding pilots, it's not clear to me what this is going to buy you," said John Pike, director of GlobalSecurity.org, a defense think tank in Alexandria, Va. "It's not clear to me what difference this would make unless they're going to put some antiaircraft missiles in front of the castle or something to enforce it."

However, the no-fly zones do provide an effective defense against **Disney's** decades-old business foes, self-styled guerrilla advertisers who try to lure customers away from **Disney** to area nightclubs and attractions. At its height, the Orlando air wars daily featured biplanes towing banners, blimps and single-wing skywriters competing for attention.

Today, aerial advertisers, such as Kittinger, can't sell their services if they have to fly above 1,200 feet. Flying in the no-fly zones these days can cost them their pilots' licenses.

BEHIND CLOSED DOORS

**Disney** got what it wanted with only 65 little-noticed, highly technical words tucked into a foot-thick, 3,000-page spending bill approved by Congress this year. Not one of those words was "**Disney.**"

In February, House and Senate leaders sat down in private to work out differences in their competing versions of the $397.4 billion spending bill.

According to three sources familiar with or involved in the private meetings, Sen. Ted Stevens, an Alaska Republican who chairs the committee that oversees all federal spending, and Sen. Richard Shelby, an Alabama Republican in charge of the subcommittee on transportation spending, were instrumental in adding the **Disney** provisions.

While the bill had originally offered flight protections only to some sports stadiums during games, it now forced the FAA to put the no-fly zones over the entertainment giant's parks as well.

"Mr. Shelby and Mr. Stevens had some particular interest in adding **Disney,**" said a House source familiar with the meetings. Shelby sought to include the provision in a private meeting

with his House counterpart, Rep. Harold Rogers, R-Ky., the source said. A spokeswoman for Shelby said the senator had several meetings with Rogers but did not specifically ask for **Disney** to be added.

An Appropriations Committee spokesman for Stevens, another spokeswoman for Shelby and a Democratic appropriations spokeswoman all confirmed it was added when the bill reached the Senate but did not say by which senator.

A second House source familiar with the process said Shelby and Stevens had been influenced by **Disney** lobbyist Mitch Rose, who had been one of Stevens' most trusted aides for almost a decade. Rose, who didn't return three phone calls for comment, has worked for **Disney** since 2000, when he left Stevens' office on good terms.

Goodman, the **Disney** spokeswoman, would not discuss the company's lobbying effort in any detail.

In discussions with Congress, a **Disney** lobbyist -- it's unclear whether it was Rose or another company lobbyist -- said the no-fly zones were needed to protect against terrorism, the House source said. There was no mention of annoying banner planes, he said.

"Oh, God no," the source said. "They were arguing for it on the basis of security. We weren't interested in doing it for banner ads."

Records show the company's political-action committee has given Stevens $10,000 and Shelby $2,000 since 1998. In the same period, **Disney** spent at least $14.8 million to lobby in Washington and almost evenly split $866,000 in campaign contributions between the two political parties.

The **Disney** provision passed Congress on Feb. 13 without a request from a single national-security agency. It had not been subjected to public or private review by the congressional committees that are supposed to sign off on homeland-security and transportation-policy changes, an apparent violation of congressional rules.

Under those rules, the spending bills are supposed to provide only funding for federal agencies -- not dictate policy changes to federal agencies. Though frequently done to the chagrin of many lawmakers, "It's not allowed," said Jo Powers, spokeswoman for the House Rules Committee.

RARE COMPANY

By earning its no-fly zones, **Disney** joins some of America's scariest addresses.

The closest to Orlando is St. Mary's, Ga., home port to the U.S. Navy Atlantic fleet's Ohio-class submarines. Each sub is armed with 24 Trident nuclear missiles, according to Department of Defense records.

Another no-fly zone covers the Anniston Army Depot in Anniston, Ala. More than 2,000 tons of sarin, VX nerve agent and mustard gas are stored there, Army records show.

Similar zones protect military stockpiles of chemical and biological weapons in Arkansas, Colorado, Indiana, Utah and Oregon. Some prohibit aircraft below 10,000 feet.

These and other permanent security no-fly zones were granted by the FAA after a request by the military, the Secret Service, the Department of Homeland Security or the Transportation Security Administration. **Disney's** were not.

It's not clear whether **Disney's** amusement parks would have gotten the protection without political pressure, FAA chief spokesman Greg Martin said. "We would have considered it, but the legislation makes [the FAA decision] moot," he said.

Other than **Disney,** the only other U.S. commercial enterprise given the special protection is the Valdez terminal of the Alaska oil pipeline. It handles about one-fifth of U.S. domestic oil production.

The legislation was written vaguely enough to potentially provide no-fly zones over an unlimited number of open-air public areas. But in a letter to Transportation Secretary Norman Mineta two days after the no-fly zones took effect, Shelby argued that the FAA should use the provision to ban flights only over the **Disney** properties and major sports stadiums during games.

"Along with the protections for certain sporting events, it is the intent of . . . [Congress] to provide protection from certain overflights only for Walt **Disney** World in Orlando, Florida and Disneyland in Anaheim, California," Shelby wrote in the letter, obtained by the Orlando Sentinel.

EASING FEARS

Since then, Shelby's new House counterpart, who recently replaced Rogers, raised the possibility that Congress erred in ordering the FAA to give **Disney** its special designation. In an April 30 letter to Mineta, U.S. Rep. Ernest Istook Jr., R-Okla., said he wanted to review the entire process.

Pike and other homeland-security experts said the air restrictions will do little to keep a determined terrorist away from **Disney** but may make people feel somewhat safer.

Richard Bloom, director of Terrorism, Intelligence and Security Studies at Embry-Riddle Aeronautical University in Prescott, Ariz., said it would be impossible for the United States to equally defend every potential target in the country.

Intelligence agencies have to identify when and where a threat exists and concentrate resources there. And no-fly zones can be part of a national strategy that eases the public's fear, he said.

"At times, partially or totally, a specific security measure is intended mainly for reassuring the public even if it doesn't have any significant security merit," Bloom said.

Military, police and rescue aircraft are allowed to fly through the closed zones, as are aircraft on the way to and from area airports including Orlando Executive, Kissimmee Airport and Orlando International.

Local pilots say even a slow airplane could violate the zone and within seconds stage a terrorist attack over any of **Disney's** local theme parks -- long before something arrived to shoot it down.

"These [Temporary Flight Restrictions] are jokes. Absolute jokes. But nobody has had the [courage] to stand up and tell the American public," said Kittinger, who flew 483 combat missions during three tours in Vietnam. "A dedicated terrorist could fly through it and destroy the target in a second."

A LONG BATTLE

When Congress granted **Disney** special protection, it ended for now a battle dating to the

1960s in California between the entertainment giant and aerial advertisers in California.

In Florida, the air wars heated up in the mid-1970s when Bob Snow opened Church Street Station, a downtown Orlando entertainment complex, and bought five aircraft to advertise the venture.

Twice a day for 16 years, Snow sent his planes over **Disney** to lure customers to his nightclubs and floorshows. Those customers arrived in droves -- more than 2 million a year -- until **Disney** opened its adult-oriented Pleasure Island in 1988.

"If they weren't blind, we did it," Snow said of luring **Disney** tourists to the complex he sold in 1990. "It worked out well for us. Rosie O'Grady's Flying Circus was Church Street Station."

Adding more color were blimps painted like SeaWorld's signature killer whale, Shamu, and Budweiser beer's red-and-white cans.

Skywriters wrote messages in mile-long letters. And modified banner planes flying at 40 mph towed panels seven times larger than interstate billboards to advertise products from Calvin Klein jeans to Kennedy Space Center and Universal Studios.

These guerrilla marketers were able to exploit the only space **Disney** could not control -- the public airspace above its parks.

100 BUSINESSES SUFFER

Jim Butler owns Aerial Sign Company in Hollywood, Fla., the country's largest aerial-advertising business. He says FAA restrictions since Sept. 11, 2001, bankrupted more than 100 aerial advertisers and gutted an industry that had earned more than $100 million a year.

"It's designed specifically to stop the ambush marketers, which in certain cases, we are ambush marketers -- or what I call guerrilla marketing," said Butler, who has more than 50 aircraft and flew regularly over **Disney,** NFL and NCAA Division I football stadiums, Major League Baseball parks and NASCAR racetracks. "Of course, I fly **Disney.** It's only fair game."

Some of the first voluntary rules for flying near **Disney** World took effect in 1998.

ZONE EXPANDS

That was when the FAA imposed a noise-sensitive area over **Disney's** Animal Kingdom, a wild-game theme park, at the company's request. The FAA requested, but did not require, that pilots stay 2,000 feet above the parks.

A spokesman for Busch Gardens in Tampa, however, said wild-game experts there say pilots need only stay 500 feet above the park.

It's unclear when or why, but at some point the FAA expanded the zone to include **Disney**-MGM Studios, the Magic Kingdom and Epcot, according to a map on its Web site.

**Disney** also has pushed to close airspace above a theme park it is building in Hong Kong both to "maintain an aura of fantasy" and for "safety" reasons, according to an ordinance posted on the Hong Kong government's Web site.

Open airspace is considered publicly owned in the United States, much in the same way as federal highways. But after the Sept. 11, 2001, attacks, terrorism fears helped **Disney** get what it wanted.

The company worked directly with the FAA to get airspace over its parks shut down. But the agency quickly began granting waivers to certain banner pilots, something that bothered **Disney** executives who had worked to secure "unique restrictions" for the parks, according to internal FAA e-mails obtained by the Sentinel.

Eventually, **Disney** took its cause to Congress.

AN ANGRY MAYOR

On March 17, the Department of Homeland Security raised the nation's terrorist-threat level in advance of the Iraq war. A day later, it announced a massive domestic-security initiative -- Operation Liberty Shield -- which included strengthening flight protections over certain cities.

The FAA made no mention of the congressional orders when it put the new security-based flight zones into effect over **Disney** on March 18, instead saying the parks were "potential targets of symbolic value" to terrorists.

But it did not extend similar protection to any number of other potential targets of symbolic value, including Minnesota's Mall of America, other Central Florida theme parks such as SeaWorld Orlando and Universal Orlando, and downtown Chicago, home of the Sears Tower, America's tallest building.

Mayor Richard Daley, who had been seeking to ban flights over Chicago, was livid.

"Now, think of that: Mickey and Minnie have it. I mean, I can't believe that. They get it first before we get it," Daley told the Chicago Tribune on March 19.

After several influential Illinois lawmakers lobbied Homeland Security Secretary Tom Ridge and the FAA, the flight agency put a no-fly zone over Chicago.

But the FAA took it away weeks later when it reduced the terrorist-threat levels. Homeland Security officials said it would not be returned until Chicago faced a specific and credible threat.

**Disney's** special protection remains, despite repeated declarations by local, state, and national law-enforcement officials that there has never been a "specific and credible" threat against either of the parks.

**GRAPHIC:** PHOTO: Internal FAA e-mail. This e-mail was written March 18, 2002, by a Federal Aviation Administration supervisor in Southern California to the agency's customer advocate at FAA headquarters in Washington. The e-mail shows that **Disney** received its 1st no-fly zones after Sept. 11, 2001, when company executives took their request directly to Steven J. Brown, then acting head of the FAA's Air Traffic Services.
PHOTO: Protected. Planes are not allowed to fly over the Magic Kingdom, but security experts say a small plane flown by a terrorist pilot could hit Cinderella Castle before help could arrive.
JOE BURBANK/ORLANDO SENTINEL
ORLANDO SENTINEL
MAP 2:  What's inside protected zones
The day before the start of the Iraq war, The Walt **Disney** Co. persuaded federal officials to close airspace above its theme parks permanently in Florida and California. The 24-hour no-fly zones -- which bar planes from flying below 3,000 feet in a 6-mile diameter -- are usually reserved for high-security areas such as submarine

bases and chemical-and nuclear-weapon depots. Critics charge that
rather than protecting the parks from terrorist attacks, the
restriction is a way for **Disney** to keep out competitor's aerial
advertising banners and noisy helicopters.
WALT **DISNEY** WORLD
No-fly zone over Walt **Disney** World
DISNEYLAND, CALIF.
No-fly zone over Disneyland.


**LOAD-DATE:** May 11, 2003


View: Cite | KWIC | **Full** | Custom      ◀ 3 of 4 ▶      **FAST Print**   Print | Download | Fax | Email | Text Only
FOCUS™ | Save As ECLIPSE | More Like This | More Like Selected Text

Pages:    **9**

Source:  News & Business > News > **Major Newspapers** ⓘ
Terms:  **mussenden and disney and date geq (05/03/2003)**  (Edit Search)
View:  Full
Date/Time:  Tuesday, June 3, 2003 - 1:19 PM EDT


Search | Search Advisor | Get a Document | *Shepard's* ® - Check a Citation
Eclipse ™ | History | Delivery Manager | Practice Area Pages | Change Client | Options | Feedback | Signoff | Help
About LexisNexis | Terms and Conditions

Copyright © 2003 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.