# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| JOE GLOVER, FAMILY POLICY NETWORK, and AIRSIGN, LLC, | CIVIL NO. 6:03-cv-751-Orl-22S |
| Plaintiffs, | MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION |
| v. | |
| FEDERAL AVIATION ADMINISTRATION, UNITED STATES DEPARTMENT OF TRANSPORTATION, and TRANSPORTATION SECURITY ADMINISTRATION, | |
| Defendants. | |

This memorandum is offered in support of the Motion for Temporary Restraining Order and Motion for Preliminary Injunction sought on behalf of Plaintiffs Joe Glover, Family Policy Network, and AirSign, LLC.

## FACTUAL BACKGROUND

Family Policy Network (FPN) is a 501(c)(3) non-profit organization whose mission is to educate churches, families, and others throughout North America about the moral issues of the day, so they will be equipped to be "salt and light" in the public square. Complaint, ¶ 1. In pursuit of its mission, FPN, through its President, Joe Glover, has contracted with Plaintiff AirSign, LLC ("AirSign") to fly a banner over Walt Disney World on June 7, 2003 for a period of one hour in an effort to reach homosexuals attending the annual "Gay Day" celebration with its message of hope through Jesus Christ. As a result of the below-described actions of the FAA and Congress, however, FPN's and Mr. Glover's First Amendment rights have been infringed by an unlawful prior restraint, i.e., a "no-fly" zone. This lawsuit seeks to vindicate FPN's, Mr.

1

Glover's and AirSign's First Amendment rights to communicate their message over Disney World. *Id.*

The no-fly zone was initially promulgated by the FAA shortly after the September 11, 2001 terrorist attacks. However, as initially implemented, the FAA permitted waivers to the no-fly zone whereby banner towing groups could continue their work after undergoing criminal background checks and other security measures. Then, in February of 2003, Congress codified the no-fly zones and enacted a blanket no-waiver provision. Although purportedly enacted for security reasons, in truth the no-fly zone does almost nothing to further safety, but completely destroys the ability of citizens and groups to exercise their First Amendment rights to free speech via aerial advertisers and banner towing airplanes. *Id.* at ¶ 2.

Pursuant to its authority under 14 CFR § 91.139, the FAA issued a Notice to Airmen (NOTAM) 1/3353, which imposed temporary flight restrictions on all aircraft prohibiting them from coming within a three (3) nautical mile radius or at or below three thousand (3,000) feet of any major professional or collegiate sporting event or any other major open air assembly of people. *Id.* at ¶ 15. Despite the apparent total ban on low-flying aircraft, the FAA has for some time granted waivers to allow certain flights within the restricted air space. Such waivers have in the past been granted to banner towing companies such as Plaintiff AirSign. *Id.* at ¶ 16.

On September 10, 2002, one day before the one-year anniversary of the September 11, 2001 terrorist attacks, the FAA issued NOTAM FDC 2/9583, which rescinded all previously granted waivers to the no-fly zones. Shortly thereafter, on September 27, 2002, the FAA issued a new notice, NOTAM FDC 2/0199 which cancelled the previous NOTAMs 2/9583 and 1/3353. Under the new restrictions, fly-overs were prohibited over "any stadium having a seating capacity

of 30,000 or more in which a major league baseball, national football league, NCAA Division One Football, or major motor speedway event is occurring." Waivers were once again permitted, and many banner towing aircraft returned to the air. *Id.* at ¶ 17.

Although there had been no terrorist incidents under the waiver system, on February 20, 2003, Congress imposed a total ban on waivers. In the middle of the 3000 page Omnibus Spending Bill, 108 P.L. 7, Congress codified the restrictions imposed under Federal Aviation Administration Notice to Airmen FDC 2/0199 and the restrictions that had been in effect on September 26, 2002 and that were imposed under local Notices of Airmen based on or derived from Notice to Airmen FDC 1/3353. *Id.* at ¶ 18. At the same time, Congress rescinded all waivers and exemptions and ordered the Secretary of Transportation not to grant any further waivers or exemptions except for certain purposes. *Id.*

Mr. Ibele, the pilot and owner of AirSign, applied for and received a waiver from the FAA's no-fly restrictions in mid-February, 2002. Thereafter, when the FCC revoked all waivers in September of 2002, Mr. Ibele submitted to additional background criminal checks and fingerprinting by Defendant TSA. In late September, the FAA once again modified its rules to allow for waivers, and Mr. Ibele received a second waiver. Upon passage of the Omnibus Spending Bill, however, Mr. Ibele was grounded once more, despite having met and exceeded all security requirements. *Id.* at ¶ 20.

On March 18, 2003, the FAA adopted NOTAM 3/2122, explicitly codifying the ban on Disney World fly-overs: "Aircraft flight operations are prohibited at and below 3,000 feet AGL, within a 3 nautical mile radius of the Disney World theme park . . . ." *Id.* at ¶ 20. Richard Daley, mayor of Chicago, had sought for some time for a no-fly zone over Chicago, home of the

Sears Tower. Defendants ignored his pleas for a long time, but finally relented and Chicago received a no-fly zone designation. However, unlike the ban on flying over Disney World, the Chicago ban was revoked only a few weeks later. Homeland Security officials stated that unless a specific and credible threat were demonstrated the ban would not be reinstated. *Id.* at ¶ 29.

According to the same government officials there has *never* been a specific and credible threat against Disney World. In addition, according to Defendant TSA's web site, as of June 2, 2003, the TSA "has no credible information concerning specific targets, timing, or methods of attack." *See* www2.faa.gov/specialnotams/Security%20Information%20Advisory.htm (June 2, 2003). *Id.* at ¶ 30.

The FAA's sole justification for Disney's NOTAM was reportedly that the parks are "potential targets of symbolic value" to terrorists. Orlando Sentinel Tribune, *No-Fly Zones Shield Disney's Resorts; Competitors Said Disney Used Terrorist Fears to Get Rid of Aerial-Ad Planes and Sightseeing* Helicopters, May 11, 2003. Other potential targets of symbolic value such as Minnesota's Mall of America, Six Flags over Texas, Universal Orlando, and SeaWorld Orlando, and innumerable other "targets of symbolic value" across the nation did not have similar "protection" extended to them. Complaint, ¶ 32.

Security experts have observed that the no-fly zones do not in fact serve security interests. They note that the zones prohibit only flights below 3,000 feet and within 3 miles of the center of the park, and that a terrorist bent on destruction could penetrate the zone and reach the park within seconds, well before any defense could be successfully mounted. *See, e.g.,* Sean Mussenden and Henry Pierson Curtis, *No-Fly Zones Shield Disney Resorts; Competitors Said Disney Used Terrorist Fears to Get Rid of Aerial-Ad Planes and Sightseeing Helicopters,*

Orlando Sentinel Tribune, May 11, 2003, at A1 (quoting John Pike of GlobalSecurity.org). *Id.* at ¶ 31.

## ARGUMENT

Mr. Glover and FNP are moving this Court to grant their request for a TRO in order that they can bring their message, "JESUS CHRIST: HOPEFORHOMOSEXUALS.COM," *Id.* at ¶ 14, to those in attendance at Disney's "Gay Days" in Orlando, Florida on June 7, 2003. To be sure, the message is religious in content, that is to say, it is classic First Amendment speech. *See Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995) ("our precedent establishes that. private religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression) (citing *Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384 (1993); *Board of Ed. of Westside Community Schools v. Mergens*, 496 U.S. 226 (1990); *Widmar v. Vincent*, 454 U.S. 263 (1981); *Heffron v. International Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640 (1981)).

The situs where FNP proposes to communicate its message is a public forum--the airspace approximately 1,000 feet above Disney. *See United States v. Causby Et Ux.*, 328 U.S. 256, 257 (1946) (the air above the minimum safe altitude of flight prescribed by the Civil Aeronautics Authority is a public highway and part of the public domain, as declared by Congress in the Air Commerce Act of 1926, as amended by the Civil Aeronautics Act of 1938. pp. 260, 261, 266); *Aaron v. United States*, 311 F.2d 798, 801 (Ct. Cl. 1963) (Navigable air space is at 1,000 feet over congested areas and 500 feet over other areas. Hence, flights above 500 feet over noncongested areas are in the navigable air space in which there is "a public right of freedom of transit." The public has a right to travel in this air space with the same freedom and

the same immunity as it has to travel the public highways or navigable waters). The means employed to communicate the message will be a single- engine aircraft pulling a banner that contains Mr. Glover's and FNP's message.

### A. Standard for Issuance Of TRO

"A temporary restraining order, like a preliminary injunction, is an extraordinary and drastic remedy not to be granted until the movant clearly carries the burden of persuasion as to the four prerequisites." *Northeastern Fla. Chapter of Ass'n of General Contractors of America v. Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990). And in order to obtain a preliminary injunction, the movant must demonstrate "(1) a substantial likelihood that he will ultimately prevail on the merits; (2) that he will suffer irreparable injury unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that the injunction, if issued, would not be adverse to the public interest." *Zardui-Quintana v. Richard*, 768 F.2d 1213, 1216 (11th Cir. 1985); *Gold Coast Publications, Inc. v. Corrigan*, 42 F.3d 1336, 1343 (11th Cir. 1994); *see also, Ingram v. Ault*, 50 F.3d 898, 900 (11th Cir. 1995) (same standard applies to a request for a temporary restraining order). Plaintiffs meet this standard here.

### B. There Is a Substantial Likelihood That Plaintiffs Will Ultimately Prevail On the Merits

In this post 9-11 world it is tempting to simply nod in quiescent affirmation whenever our government purports to legislate and regulate in the name of domestic security and national defense. And the government has, in this case, effectively closed the airspace over the Disney parks to banner towing on such a premise, stating the parks are "potential targets of symbolic value" to terrorists. Nevertheless, when this frightening but naked assertion is measured against

6

the facts and the law, it vanishes as quickly as Count Dracula at sunrise.

### 1. The First Amendment Does Not Evaporate With the Mere Intonation Of Interests Such As National Defense or Domestic Security

If the lessons of history mean anything, it is that the First Amendment does not evaporate with the mere intonation of interests such as national defense or domestic security. Those interests "cannot be invoked as a talismanic incantation to support any exercise of . . . power." *United States v. Robel*, 389 U.S. 258, 263 (1967); see *New York Times Co. v. United States*, 403 U.S. 713 (1971). "In all cases where such interests have been advanced, the inquiry has been whether the exercise of First Amendment rights necessarily must be circumscribed in order to secure those interests." *Greer v. Spock*, 424 U.S. 828, 853 (1976) (Brennan, J., dissenting).

Indeed, as Mr. Chief Justice Warren observed in striking a portion of the Subversive Activities Control Act of 1950 as an unconstitutional abridgment of the First Amendment right of association:

> [T]his concept of 'national defense' cannot be deemed an end in itself, justifying any exercise of legislative power designed to promote such a goal. *Implicit in the term 'national defense' is the notion of defending those values and ideals which set this Nation apart....* It would indeed be ironic if, in the name of national defense, we would sanction the subversion of one of those liberties -- the freedom of association -- which makes the defense of the Nation worthwhile.

*Robel*, 389 U.S. at 264 (emphasis supplied).

Similarly, in *United States v. United States District Court*, 407 U.S. 297 (1972), the Court held that the concededly legitimate Government need to safeguard domestic security through wiretapping did not ipso facto vitiate protections vouchsafed by the Fourth Amendment, especially because such surveillance posed a threat to First Amendment interests. In particular, the Court held:

> As the Fourth Amendment is not absolute in its terms, our task is to examine and balance the basic values at stake in this case: the duty of Government to protect the domestic security, and the potential danger posed by unreasonable surveillance to individual privacy and free expression. If the legitimate need of Government to safeguard domestic security requires the use of electronic surveillance, the question is whether the needs of citizens for privacy and free expression may not be better protected by requiring a warrant before such surveillance is undertaken. We must also ask whether a warrant requirement would unduly frustrate the efforts of Government to protect itself from acts of subversion and overthrow directed against it.

*Id.*, at 314-315 (emphasis supplied).

And so, the inquiry here must be whether the exercise of Mr. Glover's and FNP's First Amendment rights necessarily must be circumscribed because Disney is a potential target of symbolic value to terrorists. Mere potentiality, however, must fail as a sufficient reason to circumscribe First Amendment rights unless we are to assume that our government has been terribly reckless in failing to extend the same protection to the hundreds, even thousands, of other such targets across America.[1] Potentiality in this case is synonymous with rank speculation and is demonstrably untethered from reality and fact.

Government is not free to foreclose expressive activity in public areas on mere speculation about danger. *Cf. Boos v. Barry*, 485 U.S. 312, 330 (1988) (upholding a ban on congregations within 500 feet of a foreign embassy against overbreadth and vagueness challenges, noting that the statute does not reach peaceful congregations, only "groups posing a security threat"); *Community For Creative Non-Violence*, 468 U.S. at 311 (Marshall, J. dissenting) ("A mere apprehension of difficulties should not be enough to overcome the right to free expression"); *United States v. Grace*, 461 U.S. 171, 182 (1983) (when there is no evidence

---

[1] Other than the Valdez terminal of the Alaska oil pipeline, Disney is the only other commercial enterprise given the special protection.

8

of obstruction, threatened injury or interference with orderly administration, a ban on carrying a sign or banner on public sidewalks surrounding the Supreme Court building fails substantially to serve the stated purpose of "protect[ing] persons and property or [] maintain[ing] proper order and decorum within the Supreme Court grounds"). Otherwise, the government's restriction of First Amendment expression in public areas would become essentially unreviewable.

Furthermore, for eighteen months after the 9-11 attack the government saw no need to issue a NOTAM for Disney. And even now, by TSA's own admission, there is no reason for the NOTAM; as of June 2, 2003, the TSA website states it "has no credible information concerning specific targets, timing, or methods of attack." Complaint, ¶ 30. In other words, nothing has changed for Disney since it was reported that, "[t]hroughout the current crisis, Disney officials have said that law-enforcement and government officials tell them there is no reason to believe the theme parks should be considered any more of a target than other public places." Wall St. J. Com., *Special Report: Aftermath of Terror - Industries That May Be Vulnerable Race to Boost Security and Limit Disruptions*, September 28, 2001, www.absconsulting.com/news/wsjsept28-01.

Such assurances by law enforcement and government officials, confirmed as they are by the complete absence of any evidence to the contrary since the 9-11 attacks, leave no constitutional breathing room for Disney's NOTAM. To only slightly paraphrase Mr. Chief Justice Warren, implicit in the term "domestic security" is the notion of defending those values and ideals which set this Nation apart. It would be indeed ironic if, in the name of domestic security, this Court failed to restrain the government from subverting one of those liberties.

### 2. The Disney NOTAM Is Not A Reasonable Time, Place, Or Manner Restriction, Is Not Narrowly Tailored, And Does Not Leave Open Ample Alternative Channels For Communication[2]

The Supreme Court has reaffirmed time and again that,

> in a public forum, the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) (quoting *Clark v. Community For Creative Non-Violence*, 468 U.S. 288, 293 (1984)).*See also Frisby v. Schultz*, 487 U.S. 474, 481(1988) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)). It is the government bears the burden of proving that the "narrowly tailored" and "alternative communication" prongs are satisfied. *See Community for Creative Non-Violence*, 468 U.S at 293 n. 5 (1984) (once plaintiff demonstrates that First Amendment applies, the government bears burden of justifying impingements on protected activity).

The Disney NOTAM is not a mere restriction on First Amendment activity, it operates as a complete ban for those who need to communicate their message by banner towing which requires a pilot to fly at 1,000 feet above the ground in order for the banner to be legible to observers on the ground.

In *Bay Area Peace Navy v. United States*, 914 F.2d 1224 (9th Cir. 1990), a civilian boat association, Peace Navy, found itself in a similar circumstance to FNP when the Navy imposed a 75-yard security zone around a pier during a naval parade. Peace Navy wanted to communicate their message, via private water craft, to government dignitaries who were observing the parade

---

[2] The Disney NOTAM is content neutral.

from the pier. *Id.* at 1225-26. The 75-yard security zone rendered the Peace Navy's water-borne demonstration "completely ineffective" and passing out pamphlets on land or demonstrating at the entrance to the pier were not viable alternatives because the invited visitors, who were the Peace Navy's intended audience, were not accessible from those positions. *Id.* at 1229.

The only evidence offered by the government to support its claim that a 75-yard zone was essential to serve security interests was the existence of terrorism in the world generally and the opinions of various military personnel that a 75- or 100-yard zone was needed to protect against acts of terrorism. In fact, Navy Commander George Farrar testified, in response to a question by the district court, that to his knowledge there had never been a "known threat" that would affect the audience on the Aquatic Park Pier. The district court noted there was no showing that Fleet Week presents "any danger that is not present each time a public official appears in public.'" *Id.* at 1227-28.

Although the government legitimately asserted that it did not need to show "an actual terrorist attack or serious accident" to meet its burden, the court stated it is not free to foreclose expressive activity in public areas on mere speculation about danger. *Id.* at 1228. The court concluded that the 75-yard security zone "burden[ed] substantially more speech than is necessary to further the government's legitimate interests" and is therefore "substantially broader than necessary to achieve the government's interest" in protecting the audience on the pier from a speculative threat of violent attack or in promoting "marine safety" generally. *Id.* at 1228-29; *see also Frisby v. Schultz*, 487 U.S. 474, 485 (1988) ("A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy") (citing *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 808-10 (1984)).

Content-neutral time, place, and manner regulations must not unreasonably limit alternative avenues of communication. *Ranch House, Inc. v. Amerson*, 238 F.3d 1273, 1279 (11th Cir. 2001).

An alternative is not ample if, for example, the speaker is not permitted to reach the intended audience. *See Heffron v. International Soc. for Krishna Consciousness*, 452 U.S. 640, 655 (1981) ("The First Amendment protects the right of every citizen to 'reach the minds of willing listeners and to do so there must be opportunity to win their attention.'" (quoting *Kovacs v. Cooper*, 336 U.S. 77, 87(1949)); *Students Against Apartheid Coalition v. O'Neil*, 660 F. Supp. 333, 339-40 (W.D. Va. 1987) (university regulation prohibiting erection of protest shanties on lawn of building where Board of Visitors meets is not rendered valid by permission to erect shanties elsewhere on campus, in place not visible to members of Board, the intended audience), *aff'd*, 838 F.2d 735 (4th Cir. 1988); *See also Dr. Martin Luther King, Jr. Movement, Inc. v. City of Chicago*, 419 F. Supp. 667, 674 (N.D. Ill. 1976) (parade route through black neighborhood not constitutional alternative to route through white neighborhood when intended audience was white).

There are not ample alternative avenues of communication for those who, like Mr. Glover and FNP, desire to communicate their message to people at the Disney parks. Banners towed by aircraft are not legible to observers on the ground from 3,000 feet. Disney, a private company, would undoubtedly remove Mr. Glover if he attempted to distribute leaflets on its property. Moreover, it would be impossible for a single individual to communicate his message as simply and effectively to as many people as banner towing permits. *See Taxpayers for Vincent*, 466 U.S. at 812 (alternative mode of communication may be constitutionally inadequate if the speaker's

ability to communicate is effectively is threatened).

### C. FNP Will Suffer Irreparable Injury to Its First Amendment Rights if Relief is not Granted

It is beyond argument that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *News-Journal Corp. v. Foxman*, 939 F.2d 1499, 1512 (11th Cir. 1991) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *Zemel v. Rusk*, 381 U.S. 1, 17 (1965). FNP, if relief is not granted, will lose the opportunity to communicate its message to the participants at Disney's "Gay Days." The loss would be one of constitutional magnitude, grounded in the First Amendment, and would constitute irreparable injury to FNP.

### D. The Threatened Harm to FNP Outweighs Whatever Damage the Proposed Temporary Restraining May Cause the Government

There is no question that the government has a significant interest in domestic security. But, as was shown *supra*, mere intonation of that interest as justification for granting Disney a no-fly zone is wholly inadequate to justify the NOTAM. *See Robel*, 389 U.S. at 263 (1967). The government offered *no evidence* that the Disney NOTAM was necessary to circumscribe First Amendment rights, nor did it offer any explanation about how the three nautical mile and 3,000 foot restriction would accomplish the desired goal of protecting against an attack from the air. Furthermore, Mr. Ibele has previously flown over Disney and has twice obtained security clearances and obtained waivers to fly in NOTAM zones. Complaint, ¶ 20.

The government has no explanation as to why the waiver provisions and security clearances utilized before Congress codified the NOTAM restrictions were inadequate to meet domestic security concerns. In short, every known fact and reasonable inference therefrom

establishes beyond peradventure that there is no basis for the government to argue that the exercise of First Amendment rights necessarily must be circumscribed in order to secure domestic security interests through the Disney NOTAM. *See, e.g., Greer*, 424 U.S. at 853 (1976) (Brennan, J., dissenting). The loss of First Amendment rights for FNP and Mr. Glover is both certain and irreparable if the TRO is not granted; the government, on the other hand will suffer no harm if the TRO issues because the interest it purports to advance with the Disney NOTAM is rooted in nothing less than naked speculation.

### E. The Temporary Restraining Order, If Issued, Would Not Be Adverse to the Public Interest

Preventing governmental interference with the exercise of First Amendment rights is most certainly in the public interest. Domestic security is also in the public interest. Domestic security was clearly served before the Disney NOTAM when security clearance was required of banner-towing pilots and others in order to obtain waivers and exemptions to NOTAM's. With the revocation of waivers for flights over restricted zones and the creation of the Disney NOTAM, domestic security was not enhanced, but the First Amendment rights of those who desired to communicate their messages over the restricted zones suffered a fatal blow. A TRO will not, therefore, be adverse to the public interest.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that this Court grant their Motion for a Temporary Restraining Order.

Respectfully submitted,

_____
Stephen M. Crampton, Trial Counsel
MS Bar No. 9952
(Pending admission Pro Hac Vice)
Brian Fahling, WA Bar No. 18894
(Pending admission Pro Hac Vice)
AMERICAN FAMILY ASSOCIATION
CENTER FOR LAW & POLICY
P.O. Drawer 2440/100 Parkgate
Tupelo, MS 38803
(662) 680-3886

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was furnished via facsimile to the following counsel for Defendants:

Roberto Rodriguez, Esq.
Assistant United States Attorney
Middle District of Florida
80 N. Hughey Avenue
Orlando, FL 32801
(407) 648-7500
Fax: (407) 648-07643

and via e-mail to the following counsel:

Brian Kennedy, Esq.
Assistant United States Attorney General
U.S. Department of Justice

Washington, D.C.
brian.kennedy@usdoj.gov

on this the 3rd day of June, 2003.

Stephen M. Crampton