IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JOE GLOVER, *et al.*,                    )
                                         )
        Plaintiffs,                      )
                                         )
                v.                       ) Civil Action No. 6:03-CV-751-ORL-22GG
                                         )
FEDERAL AVIATION                         )
ADMINISTRATION, *et al.*,                )
                                         )
        Defendants                       )
_____)

### DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

Plaintiffs seek a temporary restraining order that would enable them to fly a plane within the safety and security cordon mandated by Congress in the airspace above a crowded open-air gathering in a iconic American location, Disney World. They have not carried their burden of showing that such an extraordinary remedy is warranted. Indeed, plaintiffs do not demonstrate that this Court even has subject matter jurisdiction. Federal Aviation Administration orders closing air space are reviewable only by direct petition to a court of appeals.

On the merits, plaintiffs fail to overcome the "presumption of constitutionality which attaches to every Act of Congress," *Walters v. Nat'l Ass'n of Radiation Survivors*, 468 U.S. 1323, 1323 (1984) (Rehnquist, J., in chambers). Plaintiff Glover himself acknowledges estimates that 135,000 people will be crowded into Disney World, Glover Decl. ¶ 6, which makes it the largest "target audience" this year for a message he wishes to have towed through the air, *id.* at ¶ 8. But 135,000 people are a potential target for more than Mr. Glover. After September 11, 2001, Congress could reasonably conclude that safety and security precautions in the skies above

massive open-air gatherings at iconic American locations are warranted. These precautions are taken not only without regard to the whatever particular message Mr. Glover wishes to convey but also without regard to whether aircraft intruding into the restricted airspace carry <u>any</u> message at all. Except for aircraft that can satisfy one of the limited operational exceptions, the ban applies not only to banner towers, but also to corporate jets, scheduled airlines, crop dusters, sightseers, stunt flying exhibitions, air taxis, news helicopters, and training flights. This facially neutral air traffic regulation raises no First Amendment issue. *See Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 708 (1986) (O'Connor, J., concurring). Plaintiffs argue that the restrictions are either too little because terrorists have not struck yet, or too much, because only an even broader restriction would with certainty stop a determined terrorist, and because other potential targets are not also covered. But the line-drawing needed to balance the interest in aviation security against aviation convenience is quintessentially for legislative rather than judicial, judgment.

The balance of hardships and public interest also weigh heavily against plaintiffs. Although they claim that a banner could be flown and seen only within the restricted airspace, banners are commercially available and advertised on the Internet that can readily be seen when flown above 3,000 feet, <u>outside</u> the restricted airspace. *See* http://www.bigup.com/newsusbannerindustryadjusts.htm (visited June 3, 2003). Plaintiffs provide no convincing explanation why they choose to go lower into restricted airspace. Nor do plaintiffs explain why they cannot use any of the many other means of conveying their message. And it certainly does not weigh in plaintiffs' favor that this Court is presented with this matter on a last-minute basis because <u>plaintiffs</u> delayed until the eleventh hour to arrange for banner towing.

The harm that would result from a terrorist attack on Disney World far outweighs whatever harm plaintiffs may incur. The Court should not second-guess the determination of Congress that these safety and security precautions are in the public interest.

## STATEMENT

### 1. Airspace Restrictions Over Major Outdoor Assemblies

Congress has mandated that the Secretary of Transportation ("Secretary") "shall keep in full force and effect" for at least one year restrictions imposed under specified "Notices To Airmen" issued by the Federal Aviation Administration ("FAA"). Consolidated Appropriations Resolution, 2003, Division I, Section 352, Pub. L. No. 108-7, 117 Stat. 11, 419-20 ("Section 352"). The prior restrictions referred to in the statute include Disney World and Disneyland, major league baseball, major league football, Division I college football, and major motor speedway events (collectively "airspace-restricted open air assemblies"). Complaint ¶¶ 19, 24, 28. The FAA accordingly issued "Notices to Airmen" ("NOTAMs") that continue restrictions on air traffic under 3,000 feet within three nautical miles of those airspace-restricted open air assemblies, including NOTAM 3/2122 (Exhibit 1), which prohibits low-level flights over Disney World. Complaint ¶ 28.[1]

Plaintiffs allege that prior to the passage of Section 352 the FAA had a practice of granting "waivers" to the restrictions for flights over airspace-restricted open air assemblies, and that plaintiff Airsign had obtained some such waivers. Complaint ¶ 16. In order to obtain such a waiver, pilots had to fill out and submit a form, available on the Internet, which was

---

[1] Plaintiffs do not appear to challenge the FAA's interpretation of what events are or are not covered by the terms of the statute.

supplemented with a criminal history check. *See* http://www2.faa.gov/ats/ata/waiver/ (visited May 29, 2003). However, as there are more than 19,000 public and private airports in the United States from which banner towing and other aircraft may be flown, it would be enormously expensive for the government to visit each airport – let alone each cockpit just before takeoff – to assure that the person flying the plane is actually named in the waiver, and neither before nor after passage of Section 352 has the Government attempted to do so.

Section 352 provides that the FAA must rescind "any waivers or exemptions" from the prior airspace-restricted open air assemblies, and then provides that new waivers or exemptions may be granted for limited purposes set out in Section 352 itself. Section 352(a)(2). Those purposes are for "operational and safety purposes" authorized by "air traffic control"; for "operational purposes" of an event, stadium, or other venue, including transportation of equipment, team members, officials, immediate family members and guests; for broadcast coverage; for "safety and security purposes of the event"; and "to the extent necessary to arrive at or depart from an airport using standard air traffic procedures." Section 352(a) (3).

Beginning no earlier than one year after enactment of Section 352, the FAA may terminate or modify the open assembly flight restrictions, or issue additional waivers or exemptions, if the agency promulgates a rule setting standards for doing so that will "provide a level of security at least equivalent to that provided by the Secretary as of the date of enactment of the Act." Section 352(b). "Unless and until" such a rule is promulgated, no appropriations may be used to grant any waivers or exemptions from the flight restrictions other than those expressly allowed by Section 352. Section 352(d).

<u>ARGUMENT</u>

I.  THE COURT LACKS SUBJECT MATTER JURISDICTION OVER
    PLAINTIFFS' CHALLENGE TO FAA ORDERS PROHIBITING
    FLIGHTS INTO DISNEY AIRSPACE

Although the plaintiffs <u>contend</u> that an Act of Congress ("Section 352") is

unconstitutional, the proximate <u>cause</u> of their inability to fly into the security zone around Disney

World is NOTAM FDC 3/2122, the FAA order that restricts the flight area.[2]  This Court lacks

jurisdiction to consider the legality of the FAA's action or to enjoin the FAA's enforcement of its

order restricting airspace.

Orders of the FAA with respect to safety and security duties and powers are generally

subject to review by petition for review filed directly with a <u>court of appeals</u>.  49 U.S.C. § 46110;

*see, e.g., Green v. Brantley*, 981 F.2d 514 (11th Cir. 1993); *Southern Aerial Advertisers Ass'n v.*

*FAA*, 881 F.2d 672 (9th Cir. 1989) (order restricting banner-towing aircraft from certain airspace

properly subject to review through direct petition to court of appeals).[3]  Where such statutory

provisions for direct court of appeals review exist, the court of appeals' jurisdiction is <u>exclusive</u>

---

[2] The denial by the FAA of a waiver application could also be viewed as a proximate cause of a plaintiff being unable to fly, and might also be potentially viewed as an "order" subject to review in the Court of Appeals.  It is not clear whether Section 352, which bars the FAA from using any appropriations to "grant" waivers, precludes it from considering and <u>denying</u> waivers. *Cf. United States v. Bean*, 537 U.S. 71 (2002) (where statute precluded agency from expending any funds to "investigate or act upon" application, such application was not "denied" and, since judicial review is available only where application was denied, judicial review was unavailable).

[3] In a recent unreported decision, *Boomer Aviation, Inc. v. Garvey*, No. 01-15730 (11th Cir. Oct. 16, 2002), the Court of Appeals held that banner towers' challenges to NOTAMs were not "orders" subject to review in the court of appeals because there was an insufficient record for an informed review.  Even if *Boomer* were binding, it would be distinguishable here because there appears to be no dispute that NOTAM FDC 3/2122 conforms to the mandate of Section 352, and hence no record is needed for review.

and precludes district court jurisdiction. *E.g., Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994). This exclusive jurisdiction of the court of appeals includes not only direct appeals of the agency's orders but also attempts to obtain separate rulings on legal issues that will affect orders subject to direct court of appeals review. *See, e.g., Thunder Basin* (litigant may not challenge in district court validity of regulation that would be enforceable by agency orders subject to direct court of appeals review); *Green v. Brantley*, 981 F.2d 514 (11th Cir. 1993) (district court lacks jurisdiction to entertain *Bivens* action that necessarily challenged an FAA "order" subject to exclusive review in the court of appeals); *Telecommunications Research and Action Center v. FCC*, 750 F.2d 70, 75 (D.C. Cir. 1984) ("any suit seeking relief that might affect the Circuit Court's future jurisdiction is subject to the exclusive review of the Court of Appeals"). Nor does it matter in this respect that (we assume *arguendo*) the agency lacked authority to decide whether Section 352 was constitutional before issuing an order complying with its mandate. *Thunder Basin*, 510 U.S. at 215.

We recognize that, if plaintiffs' only claim is a <u>facial</u> challenge to a <u>statute</u>, this Court may exercise subject-matter jurisdiction. *E.g., Time Warner Entertainment Co. v. FCC*, 93 F.3d 957, 965 (D.C. Cir. 1996), *reh'g denied*, 105 F.3d 723 (D.C. Cir. 1997). However, such jurisdiction is available only "so long as that challenge is not raised in a suit challenging the validity of agency action taken pursuant to the challenged statute or in a suit that is collateral to one challenging the validity of such agency action." 93 F.3d at 965. Accordingly, while this Court would have jurisdiction to address a facial challenge to the constitutionality of Section 352, it does not have jurisdiction to address a challenge to the statute "as applied" by the FAA. In particular, a challenge to the agency action in issuing NOTAM FDC 3/2122 could proceed only in a court of

appeals. Since it is the agency order, rather than Section 352, that is the proximate cause of the flight restrictions, the limited jurisdiction available in this case would not support an injunction or restraining order against the flight restrictions, even if the requisites for preliminary relief were met. At most, the Court would be limited to entering a judgment concerning the constitutionality of Section 352.[4] Accordingly, only the court of appeals would have jurisdiction to grant what plaintiffs' motion seeks, temporary relief against the flight restrictions themselves.

II. PLAINTIFFS ARE NOT ENTITLED TO THE EXTRAORDINARY REMEDY OF A TEMPORARY RESTRAINING ORDER

As plaintiffs acknowledge, a temporary restraining order is "'an extraordinary and drastic remedy,'" that ought not be granted unless "'the movant clearly carries the burden of persuasion as to the four prerequisites.'" Pls' Mem. at 6, *quoting Northeastern Florida Chapter of Ass'n of General Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990). In order to obtain such extraordinary relief, plaintiffs must demonstrate 1) a substantial likelihood that they will ultimately prevail on the merits; 2) that they will suffer irreparable injury without a restraining order; 3) that the threatened injury to plaintiffs outweighs the injury threatened by the injunction; and 4) that the injunction, if issued, would not be adverse to the public interest. *See, e.g., Ingram v. Ault*, 50 F.3d 898, 900 (11th Cir. 1995). Plaintiffs have failed to show any such justification for the extraordinary relief they seek.

---

[4] Even if this Court had jurisdiction to rule on the FAA's administration of Section 352 vis-à-vis plaintiffs, the Transportation Security Administration has not been asked to consider any waiver request for this flight, so there is both no waiver authorizing the flight nor a final agency action denying a waiver that could be subject to review at this time in any court.

A.    There Is No Reasonable Likelihood That Plaintiffs Will
      Prevail Upon The Court To Strike Down An Act Of Congress

1.  Section 352 Advances Compelling Governmental Interests

In enacting legislation Congress is under no obligation to state what circumstances

prompted the legislation or to create a record for judicial review:

> [B]ecause we never require a legislature to articulate its reasons for enacting a
> statute, it is entirely irrelevant for constitutional purposes whether the conceived
> reason for the challenged distinction actually motivated the legislature. . . . Thus,
> the absence of " 'legislative facts' " explaining the distinction "[o]n the record,"
> 294 U.S.App.D.C., at 389, 959 F.2d, at 987, has no significance in rational-basis
> analysis. . . . See *Nordlinger v. Hahn*, 505 U.S. 1, 15 (1992) (equal protection
> "does not demand for purposes of rational-basis review that a legislature or
> governing decisionmaker actually articulate at any time the purpose or rationale
> supporting its classification"). In other words, a legislative choice is not subject to
> courtroom fact-finding and may be based on rational speculation unsupported by
> evidence or empirical data.

*Federal Communications Comm'n v. Beach Communications, Inc.*, 508 U.S. 307, 315 (1993)

(citations omitted).

Accordingly, Congress was under no obligation to create a record before enacting

Section 352. Nevertheless, after September 11, 2001, reasons for congressional concern over

low-level flights over crowded open air assemblies are only too apparent.

a.  The Threats Of Terrorism

The provisions of Section 352 closely correspond to vulnerabilities to terrorist attack.

First, one thing the airspace-restricted open air assemblies have in common is that they

are crowded. The damage radius of any means of attack--the aircraft itself as a flying bomb,

bombs dropped from aircraft, or aerosol attack using biological or chemical agents--will thus

- 8 -

include a maximum number of victims, more victims not only than an attack on an empty field, but also more than an attack on a suburban or even city street.

Second, crowds at airspace-restricted open air assemblies (unlike, say, the Mall of America, *cf.* Complaint ¶ 32) are usually out in the open, at Disney, for example, waiting in line for a ride, on an outdoor ride, or watching an outdoor show. No building or wall protects bare flesh from the impact of even a small plane. No window or duct tape protects lungs from the invasion of airborne chemicals or germs.

Third, the airspace-restricted open air assemblies are peculiarly iconic symbols of America. Terrorists are interested not only in raw damage, but in terror, in inflicting psychological and symbolic injury. An attack that damaged the Statue of Liberty after visiting hours might not kill anyone. Objectively speaking, the attack would merely damage property. But such a description would not even begin to convey the real damage. Attacks on baseball or football or Disney World, landmarks of the American psyche, would have a similar impact.

Fourth, in addition to the possibility of actual attack, Congress could legitimately take into account reasonable fears of attack. Partly for the reasons we have just reviewed, the possibility of such attacks have become a staple of fiction (Congress wants to keep it fiction). Crowds who see planes close overhead may reasonably fear attack, and Congress can legitimately seek to reduce such flights and such fears, even if particular flights pose no actual danger. This point is illustrated by a jet's recent low-level fly-by of the New York skyline.[5] The actual danger from that particular flight was extraordinarily low: The FAA knew that the plane

---

[5] An account of the incident and of public reactions appears at http://edition.cnn.com/2003/05/15/faa.ny.overflights/ (visited May 25, 2003).

contained American troops. But the _fear_ the flight provoked in the people of New York was nevertheless reasonable, and there will be no such flights in the future. Similarly, Congress may appropriately take steps to reduce what potential victims may reasonably perceive as the dangers associated with low-level overflights of crowded open-air events regardless of the actual danger posed by any particular flight.

### b. Operational Safety Concerns

Some of the same factors that make crowds inviting terrorist targets also create unusual vulnerabilities in terms of ordinary accidents. A plane that crashes into an unprotected crowd will do considerable damage whether the crash is caused by design or mischance. Moreover, major open air assemblies can attract crowds not only on the ground, but also in the air, which creates a potential for congestion. These are not ideal conditions for low-level, low-margin-for-error flight operations. The special vulnerability of unprotected crowds in the vicinity of crowded skies adds weight to the security justifications of Section 352.

Congress had ample reason for such safety concerns at major open air events. The National Transportation Safety Board described one incident as follows:

> [A]ir traffic control (ATC) observed an unidentified aircraft circle a coliseum . . . during a major football game. Two pilot witnesses at the game observed the same make and model airplane over the coliseum 500/700 above ground level near the accident time. . . . The pilot stated that his passenger had gotten into the rear seat to photograph the coliseum football game. . . . The last thing the pilot recalled was asking his passenger if she could read the scoreboard.

Ex. 3. The plane crashed into a high school cafeteria, killing the passenger. _Id._ In another incident, a plane buzzed an NFL stadium and crashed into the upper deck, fortunately (this time) after rather than during the game. Ex. 4. A helicopter lost power 800 feet over Joe Robbie

Stadium the day before the 1995 Superbowl and hard landed next to the Stadium. Ex. 5. The preceding incidents did not involve banner towers; Section 352 does <u>not</u> single out banner towing aircraft but applies to aircraft generally such as the ones involved in these incidents. Other incidents involved banner towers and also illustrate the real possibilities for mishap and harm in a crowded environment. Ex. 6 (banner tower at Cincinnati Bengal game forced to ditch in river); Ex. 7 (banner from unidentified plane landed on roof and power lines in Pittsburgh afternoon of AFC football championship). "[S]afety and efficiency in the administration of our nation's air traffic" are "legitimate governmental objectives." *Dehainaut v. Peña*, 32 F.3d 1066, 1075 (7th Cir. 1994). Section 352 substantially furthers those objectives.

### 2. Section 252 Does Not Violate the First Amendment

#### i. Section 352 Regulates Flight, Not Speech, And Does Not Implicate the First Amendment

Plaintiffs say that, because they intend to use a plane to tow a banner, Section 352 must therefore be subject to First Amendment. That is not so. By its terms, Section 352 does not regulate speech or conduct that has an expressive element. It regulates flights. Transiting air space is neither speech nor an activity that has an expressive element.

Except for aircraft that can satisfy one of the limited operational exceptions, the ban applies not only to banner towers, but also to corporate jets, scheduled airlines, crop dusters, sightseers, stunt flying exhibitions, air taxis, news helicopters, and training flights.[6] Section 352's regulation of flights and air traffic, generally applicable to flights both with and without the appendage of a banner, is thus not properly subject to First Amendment scrutiny. *See Arcara v.*

---

[6] Contrary to plaintiffs' allegation, Complaint ¶ 1, NOTAM FDC 3/2122, does <u>not</u> exempt broadcasters from the flight restrictions over Disney World.

- 11 -

*Cloud Books Inc.*, 487 U.S. 697 (1986); *see also Lyng v. Automobile Workers*, 485 U.S. 360, 364-69 (1988). To be sure, the use plaintiffs want for their plane happens to be to transport a message. But that kind of argument, as *Arcara* observed, "proves too much." 487 U.S. 705. As *Arcara* explained, generally applicable rules on use of buildings – fire codes or health hazards from inadequate treatment – apply to buildings in which newspapers are housed. That those particular buildings are used in producing speech, however, does not make a fire code subject to First Amendment scrutiny. *Id.* Similarly, that some planes happen to be used in transporting speech does not subject Section 352's general regulation of air traffic to First Amendment scrutiny.

A law regulating conduct other than speech that has an incidental effect on speech is not subject to heightened First Amendment scrutiny. For example, "[t]he fact that an economic regulation may indirectly lead to a reduction in a [commercial speaker's] advertising budget does not itself amount to a restriction on speech." *Glickman v. Wileman Bros*, 521 U.S. 457, 470 (1997). Such a law presents "simply a question of economic policy for Congress and the Executive to resolve" rather than "a First Amendment issue for" the courts. *Id.* at 468. This case is similar, except that the policy interest is homeland security rather than economic regulation. As in *Glickman*, the law may have an incidental effect on advertising budget of the Family Policy Network, not by reducing it as in *Glickman*, but by (according to plaintiff Glover's declaration) relegating plaintiffs to means of disseminating their message that might be somewhat more expensive or less effective (and even that is not clear[7]). That incidental effect on advertising

---

[7] Plaintiffs offer no cost comparison between flying a banner at 1,000 feet where they would prefer and flying one at 3,000 feet.

- 12 -

budgets does not, however, require that the security and safety measures contained in Section 352 be analyzed under First Amendment principles applicable to laws that regulate speech. *See Glickman.*

Justice O'Connor's concurrence in *Arcara* (joined by Justice Stevens) provides another example. She noted that it would be an "absurd result" if "any government action that had some conceivable speech-inhibiting consequences, such as the arrest of a newscaster for a traffic violation, would require analysis under the First Amendment." *Arcara*, 487 U.S. at 708 (O'Connor, J., concurring). The traffic regulation of Section 352 similarly does not require analysis under the First Amendment.

An even closer example is provided by a response to the Oklahoma City bombing. After that disaster, bollards or other heavy objects were placed on the perimeters of federal office buildings to prevent too near an approach from unauthorized vehicles. Some vehicles are used to deliver First Amendment messages: many cars have bumper stickers, and many trucks double as rolling billboards. The bollards and other safety measures prevent these messages from approaching closely to federal buildings and the officials who work there (a particularly important audience for some messages). But it would be, to use Justice O'Connor's word – "absurd" to conclude that First Amendment doctrine will determine how far away from the buildings the bollards must be placed.

Section 352 establishes a similar safety cordon excluding unauthorized vehicles from approaching too closely to likely targets. It is within the constitutional competence of Congress to so define minimum safe altitudes for flight. *United States v. Causby*, 328 U.S. 256 (1946), makes it clear that, while "navigable air space" is indeed, a "public highway," 328 U.S. at 26-61,

- 13 -

that is "because <u>Congress</u> placed it in the public domain," *id.* at 264 (emphasis supplied). The

limits of that public highway were not set at 1,000 feet because that height is in the Constitution,

but because that was the "minimum safe altitiude[ ] of flight which had been prescribed"

pursuant to <u>statute</u>. 328 U.S. at 260; *see id* at 264 ("Congress has defined navigable airspace in

terms of . . . the minimum safe altitudes of flight").[8]  In the wake of September 11, Congress

could reasonably decide that, over certain particularly vulnerable open air assemblies, the

minimum safe altitude of flight should now be 3,000 feet.[9]  One can debate the wisdom or the

details of its choice. But those are policy questions for Congress, not First Amendment questions

for a court.[10]

---

[8] The altitudes discussed in *Causby* had been established by the Executive Branch pursuant to delegation from Congress. There is, of course, no must-delegate principle of the Constitution that precludes Congress from doing so directly.

[9] *Causby* recognized that what a safe altitude is may vary with terrain, 328 U.S. at 264.

[10] In attempting to argue the contrary, plaintiffs rely heavily on a decision of a Ninth Circuit panel issued over a vigorous and persuasive dissent, that struck down a safety area around "Fleet Week," *Bay Area Peace Navy v. United States*, 914 F.2d 1224 (9th Cir. 1990). But that decision was "unusual" and turned critically on the assembly at issue being an occasion for the government's own speech, which the court thought justified its being "particularly wary of how the government regulates those objecting to the government's own speech." 914 F.2d at 1231-32 (Tang, J., concurring). By contrast, in this case, Section 352 is absolutely indifferent to what message is carried and the protections are established around private assemblies that are not occasions for the government's own speech. Moreover, in *Peace Navy*, the target audience could not be reached by leaflets or similar alternative means, 914 F.2d at 1229; by contrast, here, such means are available to plaintiffs.

ii. Even If Section 352 Were Viewed As Regulating
Speech Rather Than Flight, Its Limited And Neutral
Regulation Advances Vital Government Interests
And Is Consistent With The First Amendment

Even if plaintiffs were correct in characterizing Section 352's safety and security regula-

tion of flight as being instead a regulation of "speech," Section 352 would do no violence to First

Amendment principles. According to plaintiffs, Section 352 is a "time, place, and manner

restriction of speech" and therefore must be "narrowly tailored" and "leave ample means of

alternative communication." Pls' Mem. at 10. Section 352 easily passes muster under that

standard. The restriction is narrowly tailored to limited targets of particular significance and to

only particularly low level flights.[11] Moreover, section 352 only affects one manner of communi-

cation. It does not preclude leafletting, terrestrial banners, radio, television, or any of many other

means of communication. Indeed, Section 352 also permits banner towing itself as long as the

banners are towed at a safe height above 3,000 feet.[12] Banners that can be towed at and easily

---

[11] If anything, if there is room for debate, it is over whether the ban is extensive enough.
A fifty-mile radius, for example, would offer greater assurance against a terrorist attack. But
Congress is entitled to make a legislative value judgment concerning the difficult tradeoffs
between more safety and the costs of restricting air traffic. As a practical matter, it can be made
more difficult for terrorists to hit targets, but not utterly impossible. Congress stopped short of
what would be "necessary" to obtain absolute assurance that terrorists could not strike because of
the costs necessary to achieve that certainty; it enacted legislation less disruptive to aviation that
may at least make the terrorists' task more difficult and discourage such attacks. The question
where to draw these lines is a legislative one, and Congress may, of course, adopt legislation
"that only partially ameliorates a perceived evil." *New Orleans v. Dukes*, 427 U.S. 297, 303
(1976). Courts do not sit as "superlegislature[s]," *id.*, to second-guess whether, for example, a
bubble set at one, five, or fifty miles would have been a better balance between terror prevention
and aviation convenience than the three-mile bubble chosen by Congress

[12] In the event that this law's regulation of flight was viewed instead as a regulation of
"expressive conduct," Section 352 would similarly pass muster under the standards of *O'Brien v.
United States*, 391 U.S. 367, 377 (1968). As we have explained above: the restriction of air

(continued...)

seen from such a height are currently advertised for sale over the Internet. *See* http://www.bigup.com/newsusbannerindustryadjusts.htm (visited June 3, 2003).

Plaintiffs say that Section 352 was unnecessary because the FAA had previously issued waivers after security screening. The security waiver form, which was available on the Internet, had banner towers certify their places of business, operational itineraries, personnel information on crew and passengers, and security measures in place at their aircraft base. Neither the Transportation Security Administration ("TSA") nor the FAA before it had the resources independently to corroborate these matters or to have a permanent government presence at all of the over 19,000 public and private airports from which small planes might operate. While this may be plaintiffs' idea of a adequate security screening, Congress is entitled to make its own judgment on the matter.[13]

Moreover, any flight this Saturday by plaintiffs will simply not have been subjected to any such security screening. From the allegation that Airsign was issued a waiver last September (Ibele Decl. ¶ 12), it by no means necessarily follows that Airsign would be issued a waiver

---

[12](...continued)
traffic furthers "an important or substantial governmental interest," *id.*, the safety and security of major crowds; that interest is "unrelated to the suppression of free expression," *id.*; and the restrictions on fly-bys of crowds, narrowly constrained to relatively small windows of space, are "no greater than is essential to the furtherance of that interest," *id.*

[13] Section 352 is part of an <u>appropriations</u> act. Congress is entitled to weigh the cost in finite dollars and security resources of implementing a more truly rigorous security screening against other demands and needs and to make the legislative judgments parceling out the limited security resources of the country. Congress could reasonably conclude that the expenses that would have to be incurred in order to use a more comprehensive, planeside security-check system to assure security from numerous low-level flights at these events are too great in light of other demands on the public fisc. Under the Appropriations Clause, U.S. CONST. art. I, § 9, cl.7, that is a judgment for the legislative, rather than the executive or judicial branches. *See Office of Personnel Management v. Richmond*, 496 U.S. 414 (1990).

today, after an intervening war, orange alerts, and further terrorist strikes against American

interests (*e.g.*, in Riyadh). Since the Court lacks jurisdiction over the granting or denial of any

waiver, if it were to enjoin application of the Act to plaintiffs, it would be doing so <u>without</u> the

protection of any current security check system.[14]

B.    The Balance of Hardships and Public Interest
<u>Clearly Weigh Against a Temporary Restraining Order</u>

Both the balance of hardships and public interest weigh strongly against any temporary

restraining order breaching the restricted airspace around Disney World. When, as here, a

challenge is made to the constitutionality of an Act of Congress, the "presumption of constitu-

tionality which attaches to every Act of Congress is not merely a factor to be considered in

evaluating success on the merits, but an equity to be considered in . . . balancing hardships."

*Walters v. Nat'l Ass'n of Radiation Survivors*, 468 U.S. 1323, 1323 (1984) (Rehnquist, J., in

chambers). There is no compelling reason for this Court to strike a different balance between

aviation interests and security and safety on the ground than the one already reflected in Section

352..

Plaintiffs are free to deliver their message by numerous means wholly unaffected by

Section 352, including leafletting, terrestrial banners displayed at the entrances to Disney World,

and billboards, the Internet, radio, television, and personal conversations. At most, plaintiffs are

able to argue only that these and many other means of delivering their message would not be as

---

[14] Indeed the form of plaintiffs' temporary restraining order would allow "safety" checks, but would apparently forbid any updating of the security check. Moreover, since Section 352 removes any <u>appropriations</u> for granting such waivers, and "it would be most anomalous for a judicial order to require a Governmental official . . . to make an extrastatutory payment of federal funds," *Office of Personnel Management v. Richmond*, 496 U.S. 414, 430 (1990), it is not clear that the Transportation Security Administration has statutory authority to make such checks.

easy or as cheap as using banner towers. And they do not address at all why their message cannot be delivered with equal impact from a banner towed above 3,000 feet.

Plaintiffs also claim that emergency relief is necessary because it is <u>this</u> Saturday's "Gay Day" crowd that they wish to "target" with a message of conversion aimed at homosexuals in particular. Next Saturday, plaintiffs imply, will not do, because the target at Disney World will no longer be predominately gay. But the last-minute nature of the request should certainly not afford plaintiffs any special consideration. Although "Gay Day" is scheduled long in advance, and although the FAA Order restricting the air space was issued in March, plaintiffs have asked for a decision on only a few days notice and do not justify their delay in trying to secure banner towing services. In any event, a temporary restraining order that selectively lifted airspace security restrictions by singling out Gay Day would not be justified. The airspace protections enacted by Congress by their terms apply, and ought to be applied, without regard to the sexual orientation of the crowds they protect.

Any injuries threatening plaintiffs pale in comparison with the loss of life and the spread of terror that would result from a successful terrorist air strike on Disney World. An injunction that made such a disaster more likely would put the public at risk for such truly irreparable harms. It is no answer to say that plaintiffs ask for only one single breach of the restrictions and that the FAA could do special checks for plaintiffs' one flight. The justification for Section 352 should not be measured by the harm created by only one selective breach. *See Heffron v. Krishna Consciousness, Inc.*, 452 U.S. 640, 652 (1981). If these plaintiffs can come in at the last minute for a special exemption to fly a message aimed at homosexuals at Gay Day, there is no principled reason to reject similar last-minute requests for an exemption to fly a pro-gay-

tolerance banner at scout day, or a anti-police brutality banner at a law enforcement day, or an ad

for diet products at a weight watchers' day. Indeed, one of the plaintiffs, Airsign LLC, may

already be a plaintiff in a case that challenges Section 352 in its application to sporting events

across the board.[15]

In passing Section 352, Congress has already weighed the public's interests in security

and aviation convenience. There is no reason for this Court to reach a different conclusion how

the public's interests are best balanced and accommodated.

CONCLUSION

For the reasons stated above, plaintiffs' motion for preliminary injunction should be

denied.

Respectfully submitted,

ROBERT D. MCCALLUM, JR.
Assistant Attorney General, Civil Division

Sandra Schraibman
Brian G. Kennedy (DC Bar No. 228726)
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Rm. 7342
Washington, DC 20001
Tel: (202) 514-3357
Fax: (202) 616-8470
E-Mail: brian.kennedy@usdoj.gov

---

[15] *Advertising Air Force et al. v. Transportation Security Administration, et al.*, No.
03:03-CV-0076 RLY-WGH (S.D. Ind.) (preliminary injunction hearing scheduled, June 19,
2003). Listed among the plaintiffs in that case, described as "various entities in various parts of
the United States who are engaged in the business of 'banner towing,'" is "Airsigns LLC." It is
not known to defense counsel whether that "Airsigns LLC" is the same as plaintiff Airsign LLC
in this case.

PAUL I. PEREZ
United States Attorney

_(signature)_

ROBERTO H. RODRIGUEZ, JR.
Assistant United States Attorney
Identifying No. USA074
201 Federal Building, 80 N. Hughey Avenue
Orlando, Florida 32801
TEL 407/648-7500
FAX 407/648-7673

Attorneys for Defendants

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Defendants' Memorandum in Opposition to Plaintiffs' Motion for a Temporary Restraining Order has been sent by facsimile and hand delivery to Stephen M. Crampton, Esquire, attorney for plaintiffs, at 407/996-0103 at Holiday Inn, 304 West Colonial Drive, Orlando, Florida this 5th day of June, 2003.

_(signature)_

Assistant United States Attorney

FDC 3/2122 ZJX FL FLIGHT RESTRICTIONS ORLANDO, FL.

EFFECTIVE 0301182000 UTC (MARCH 18 AT 1500 LOCAL) UNTIL FURTHER NOTICE. PURSUANT TO RESTRICTIONS DETAILED IN SECTION 352 OF PUBLIC LAW 108-7, AND 14 CFR SECTION 99.7, SPECIAL SECURITY INSTRUCTIONS. AIRCRAFT FLIGHT OPERATIONS ARE PROHIBITED AT AND BELOW 3,000 FEET AGL, WITHIN A 3 NAUTICAL MILE RADIUS OF THE DISNEY WORLD THEME PARK (282445N/0813420W OR THE ORLANDO /ORL/ VORTAC 243 DEGREE RADIAL AT 15 NAUTICAL MILES).

THIS RESTRICTION DOES NOT APPLY TO:

(A) THOSE AIRCRAFT AUTHORIZED BY ATC FOR OPERATIONAL OR SAFETY PURPOSES, INCLUDING AIRCRAFT ARRIVING OR DEPARTING FROM AN AIRPORT USING STANDARD AIR TRAFFIC PROCEDURES;

(B) DEPARTMENT OF DEFENSE, LAW ENFORCEMENT, OR AEROMEDICAL FLIGHT OPERATIONS THAT ARE IN CONTACT WITH ATC.

THOSE WHO MEET ANY OF THE FOLLOWING CRITERIA MAY APPLY FOR A WAIVER TO THESE RESTRICTIONS:

(A) FOR OPERATIONAL PURPOSES OF THE VENUE INCLUDING THE TRANSPORTATION OF EQUIPMENT OR OFFICIALS OF THE GOVERNING BODY;

(B) FOR SAFETY AND SECURITY PURPOSES OF THE VENUE. INFORMATION REGARDING WAIVER APPLICATIONS CAN BE OBTAINED FROM THE FAA WEBSITE AT HTTP://WWW.FAA.GOV/ATS/ATA/WAIVER, OR BY CALLING 571-227-1322.

DEFENDANT'S EXHIBIT
1

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE ELEVENTH CIRCUIT

No. 01-15730

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

OCT 16 2002

THOMAS K. KAHN
CLERK

BOOMER AVIATION, INC., a Florida corporation,
AERIAL ADS, INC. OF THE SOUTHEAST,
a Florida corporation, et al.,

                                        Petitioners,

versus

JANE GARVEY, Administrator,
Federal Aviation Administration,

                                        Respondent.

On Petition for Review of Orders of
The Federal Aviation Administration

(                    )

Before BIRCH and COX, Circuit Judges, and GEORGE*, District Judge.

PER CURIAM:

---

\*Honorable Lloyd D. George, U.S. District Judge for the District of Nevada, sitting by
designation.

DEFENDANT'S EXHIBIT
2

The petitioners' request that this court review certain "Notices to Airmen," or "NOTAMS," issued by the Federal Aviation Administration ("FAA") that impose temporary flight restrictions on banner-towing aircraft. We conclude that we do not have jurisdiction to consider the petitioners' request because the challenged NOTAMS are not final "orders" within the meaning of 49 U.S.C. § 46110.

Section 46110 provides that "a person disclosing a substantial interest in an order issued by . . . the Administrator of the Federal Aviation Administration . . . may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business." 49 U.S.C. § 46110(a). In construing the predecessor statute to § 46110 (the former 49 U.S.C. § 1486), this court has noted that, to constitute an "order," the agency action must be final and "the agency record must be adequate enough to support judicial review." *Green v. Brantley*, 981 F.2d 514, 519 (11th Cir. 1993) (citing *Greater Orlando Aviation Auth. v. FAA*, 939 F.2d 954, 959 n.16 (11th Cir. 1991)). Several of our sister circuits similarly hold that whether or not an action of

---

[1] The petitioners include: Boomer Aviation, Inc.; Aerial Ads Inc. of the Southeast; William M. Bruckner, Jr., d.b.a. Florida Aerial Advertising; James Perry, d.b.a. AAA Aerial Services; Air America Aerial Ads, Ltd.; Steve Anderson, d b.a. Big Aerial Sign Service; BB Aero Works, Ltd.; Pro Air Enterprises, Inc.; Beach Banners, Inc.; Aerial Banners, Inc.; Tom King, d.b.a. Aerial Enterprises; Acro Ads, Inc.; Sky Signs, Inc.; Rush & Company, Inc.; High Signs Aerial Advertising; Phoenix Air Ads, Inc.; and Actionad Aerial Signs.

2

the FAA constitutes a reviewable "order" depends on the adequacy of the administrative record. *See Greenwood v. FAA*, 28 F.3d 971, 978 (9th Cir. 1994); *Atorie Air v. FAA*, 942 F.2d 954, 960 (5th Cir. 1991); *Suburban O'Hare Comm'n v. Dole*, 787 F.2d 186, 193 (7th Cir. 1986); *City of Alexandria v. Helms*, 728 F.2d 643, 646 (4th Cir. 1984); *Northwest Airlines, Inc. v. Goldschmidt*, 645 F.2d 1309, 1314 (8th Cir. 1981); *cf. City of Rochester v. Bond*, 603 F.2d 927, 932 (D.C. Cir. 1979). Indeed, several decisions characterize the adequacy of the administrative record as "determinative" of whether an action constitutes an "order" under § 46110. *See, e.g., Sierra Club v. Skinner*, 885 F.2d F.2d 591, 593 (9th Cir. 1989); *Suburban O'Hare Comm'n*, 787 F.2d at 193; *Helms*, 728 F.2d at 643.

In light of this authority, we cannot say that the NOTAMS challenged by the petitioners in this case are "orders" subject to review under § 46110. The agency record submitted to us consists only of the NOTAMS themselves; there is nothing to inform us about the decision-making process, nor is there anything indicating the manner in which the NOTAMS have been applied. Where, as here, restrictions imposed by the FAA are challenged on the grounds that they are arbitrary and capricious, as well as applied in a discriminatory manner, more than the restrictions themselves is needed for an informed review. *See Green*, 981 F.2d at 519 (explaining that adequate record requirement exists "so that the reviewing court may make an

3

informed decision"); *Atorie Air*, 942 F.2d at 960 (suggesting that record consisting only of challenged restriction might be sufficient to permit review of procedural improprieties, but not sufficient for substantive review). We acknowledge that both parties have submitted documents in support of their legal arguments and factual assertions, but we have found none of these documents in the administrative record submitted to us. Thus, the agency record is inadequate to allow for an informed decision on the petitioners' claims, and the NOTAMS are not final "orders" subject to our review.

DISMISSED FOR WANT OF JURISDICTION.

4

## AIRCRAFT ACCIDENT/INCIDENT PRELIMINARY NOTICE - FORM 8020-9

---

### A. INFORMATION FROM      DATE ENTERED: 11/23/1998

NOTICE FROM: OAKLAND, CA, ATCT

NOTICE TYPE: A      MID AIR COLLISION: N      MISSING: N

---

### B. AIRCRAFT INFORMATION

1. REGIS. NO: 9222T

2. MAKE/MODEL: C210      2A. DESC: T210L      2B. CATEGORY: Cessna

3. OPERATOR OF AIRCRAFT: JOHN G. REICHEL

4. ACTIVITY TYPE: Pleasure      PHASE: Cruise      GA/AIR CARRIER: General Aviation

5. OCCURRENCE DESCRIPTION:
   ACFT CRASHED INTO CASTLEMONT HIGH SCHOOL UNDER UNKNOWN CIRCUMSTANCES, THE
   PILOT SUFFERED SERIOUS INJURIES, THE PASSENGER SUFFERED FATAL INJURIES, THE
   ACFT WAS DESTROYED, NO GROUND INJURIES WERE REPORTED, OTHER CIRCUMSTANCES ARE
   UNKNOWN, OAKLAND, CA.

---

6. WEATHER: 212324Z 231004KT 15SM FEW018 BKN041 BKN100 17/11 A3011

7. DAMAGE: Destroyed

---

### C. PILOT INFORMATION

FIRST NAME: JOHN      MI: G   LAST NAME: REICHEL

STREET:      CITY: LA SELVA BEACH

STATE: CA      ZIP:      PHONE: (   )   -

---

### C2. CREW AND INJURY INFORMATION

NUMBER CREW:   1   CREW FATAL:   0   CREW SERIOUS:   1   CREW MINOR:   0

NUMBER PASS:   1   PASS FATAL:   1   PASS SERIOUS:   0   PASS MINOR:   0

GROUND INJURIES   GRND FATAL:   0   GRND SERIOUS:   0   GRND MINOR:   0

---

D. ACCIDENT LOCATION  CITY: OAKLAND      STATE: CA

E. DATE OF OCCURRENCE: 11/21/1998      UCT TIME OF OCCURRENCE: 15:15

---

F. INVESTIGATOR NAME:      REGION/DO: WP27

   DO CITY: OAKLAND      DO STATE: CA

   OTHER INVESTIGATOR: NTSB

---

### G. FAA AIR TRAFFIC SERVICES SUMMARY OF FLIGHT HANDLING

1A. DEPARTURE POINT: UNKN      1B. DEPARTURE DATE:

UCT DEPARTURE TIME: 14:30      1C. FLIGHT DESTINATION: UNKN

---

2A. LAST RADIO CONTACT POINT:      4A. FLIGHT PLAN:
    3 NNE OAK

3A. LAST ATC CONTROL CLEARANCE:      5A. PILOT BRIEFING: N
    UNKN

6A. OTHER:

---

AAI100 INVESTIGATOR:
INITIALS: HMH

DEFENDANT'S EXHIBIT
3

NTSB Identification: **LAX99FA038** . The docket is stored in the (offline) NTSB Imaging System.

14 CFR Part 91: General Aviation

Accident occurred Saturday, November 21, 1998 in OAKLAND, CA

Probable Cause Approval Date: 9/28/00

Aircraft: Cessna T210L, registration: N9222T

Injuries: 1 Fatal, 1 Serious.

The pilot and passenger departed on a cross-country flight. The flight reached the destination airport; however, due to fog and low stratus clouds the pilot diverted to another airport for lunch. On the return trip air traffic control (ATC) observed an unidentified aircraft circle a coliseum in class 'B' airspace during a major football game. Two pilot witnesses at the game observed the same make and model airplane over the coliseum 500/700 feet above ground level near the accident time. It then proceeded towards another major airport located in class 'C' airspace when the transponder was observed to quit operating about 5 miles from that airport. The airplane was then tracked as a primary target until radar contact was lost. The accident airplane crashed into a high school cafeteria about 2.25 miles northeast of Oakland International Airport. Two witness statements were obtained from persons at the Castlemont School. One reported hearing the engine cutting on and off as he watched it collide with the building. The other witness heard no engine sound and also watched it collide with the building. The pilot stated that his passenger had gotten into the rear seat while in-flight to photograph the coliseum football game. The passenger was not wearing a seat belt and neither wore shoulder harnesses at the time of accident. The last thing that the pilot recalled was asking his passenger if she could read the scoreboard. When asked how high he was flying, the pilot stated 5,500 feet mean sea level. Examination of the radios revealed the transponder was off and both communication radios were on Unicom frequencies. According to on scene emergency service personnel, there was fuel venting or running from the airplane in a steady stream. The local fire department foamed the accident area.

The National Transportation Safety Board determines the probable cause(s) of this accident as follows:

The pilot-in-command's inadequate fuel management which led to fuel starvation and subsequent loss of engine power. Also causal was the pilot's failure to maintain adequate altitude and his ostentatious display.

Full narrative available

Index for Nov1998 | Index of months

## HISTORY OF FLIGHT

On November 21, 1998, about 1515 hours Pacific standard time, a Cessna T210L, N9222T, was destroyed during a collision with a high school building in a residential area of Oakland, California. The private pilot received serious injuries and the passenger was fatally injured. The personal flight was operated by the pilot under the provisions of 14 CFR Part 91. Visual meteorological conditions prevailed and no flight plan was filed. The flight had originated at Watsonville, California, and was destined for Little River, California.

Due to fog and low stratus cloud conditions at Little River, the pilot diverted to Petaluma, California, for lunch and to call the Little River Airport for a weather update. The airport manager did not expect the weather to clear up that day. The pilot decided to cancel the trip to Little River and return to Watsonville. He stated "we got back into the plane, and after a normal run-up headed back home." At the time of the accident the flight was returning to Watsonville.

The pilot stated that en route his passenger had gotten into the right rear seat while in-flight to photograph the University of California at Berkeley, California, sports coliseum football game in progress. The last thing the pilot recalled was asking his passenger if she could see the scoreboard. When asked how high he was flying, he stated 5,500 feet msl.

An aircraft was identified by Bay Terminal Radar Approach Control (Tracon) as an Oakland International Airport Class "C" airspace intruder. They reported that the unidentified aircraft had circled the coliseum 9 miles north-northeast of Oakland International Airport (OAK). The coliseum/stadium is located in sector "H" of the San Francisco Class "B" airspace. Mode "C" transponder usage is mandatory in all Class "B" airspace. The transponder was observed to go offline 5 miles north while passing the Mormon Temple (a local area position reporting point). They continued to track the airplane as a primary radar target into the OAK Class "C" airspace. Subsequently, the accident aircraft collided with the Castlemont High School about 2.25 miles northeast of the Oakland International Airport.

Two witness statements were obtained from persons at the Castlemont School. One reported hearing the engine cutting on and off as he watched it collide with the building. The other witness heard no engine sound and also watched it collide with the building.

A commercial pilot witness attending the football game at the coliseum witnessed a Cessna 210 overfly the coliseum. He said that there were many banner towing airplanes orbiting the stadium about 1,000 feet agl. Somewhere after 1500, he observed the Cessna 210 fly directly over the stadium, entering from the north and exiting southwest. He said that the airplane's altitude was considerably less than the banner towing airplanes, and he estimated it to be 500 to 700 feet agl. He said the lighting was poor and the registration of the airplane was not clearly visible.

An ATP pilot also attending the game witnessed a Cessna 210 approach the stadium from the town of Albany, California, north-northwest of the stadium. He reported the airplane as flying low along the East Bay hills, remaining below a solid overcast of coastal stratus clouds. The airplane passed almost directly over the east side of the stadium. He said the flight path and altitude were consistent with that of an airplane

DEFENDANT'S EXHIBIT
4

being operated VFR approaching OAK for landing.

PILOT INFORMATION

The private pilot held ratings in airplane multiengine, single engine, and instrument and gliders. He reported a total of 1,392 total flight hours with 89 hours in a Cessna T210 airplane. The pilot held a third-class medical certificate dated March 2, 1998.

AIRCRAFT INFORMATION

According to the pilot's written report, the last annual inspection of the airplane was accomplished and it was returned to service on August 1, 1998, 22 hours before the accident.

In the pilot's written report on the morning of the accident, while taxiing to the runway, he observed the fuel gauges go from full to zero. He then noted that the electrical system had gone off-line and found the 60-amp alternator circuit breaker had popped. He parked the aircraft and contacted his maintenance person.

The pilot was advised that the starter solenoid had stuck during startup, the only time during operation that this solenoid is used. He was told that the high electrical drain had popped the circuit breaker. He was shown the solenoid location and given a small hammer to take with him to tap on the solenoid if it were to happen again on his trip. The maintenance person provided an auxiliary battery jump-start of the engine for the pilot.

According to refueling records, the airplane was last fueled on November 13, 1998. The logbook indicates that the flight was 2.5 tachometer hours, ending at 872.4 and 3.0 clock hours for 34.87 gallons of fuel use. The tachometer at the accident site indicated 875.4 for 3.0 tachometer hours for the accident flight. A mechanical recording tachometer is only accurate at a designed rpm; in this installation it is 2,500 rpm.

The Cessna owner's manual states that the airplane has 89 gallons of useable fuel and at 75 percent power and full fuel at 10,000 feet, no reserve, the airplane can fly for 5.4 hours. Maximum range full fuel at 10,000 feet, no reserve, the airplane can fly for 9.0 hours.

According to the Cessna Pilot Safety and Warning Supplements: Fuel Management, Poor Techniques, "Flying low during day cross-country, or moderately low at night can be hazardous if a fuel tank runs dry. By the time it is realized what caused the engine stoppage and an attempt is made to correct the fuel selector position, the airplane has lost too much altitude and contacts the ground."

The same supplement also warns of Flight Coordination vs. Fuel Flow, "It is important to observe the uncoordinated flight or side-slip limitations listed in the respective operating handbook. As a general rule, limit uncoordinated flight or side-slip to 30 seconds in duration when the fuel level in the selected tank is 1/4 full or less."

METEOROLOGICAL INFORMATION

At 1524, the Oakland weather was reported as: wind 100 degrees at 4 knots; visibility 15 statute miles; few clouds at 1,800 feet agl; broken clouds at 4,100 feet agl; temperature 62 degrees Fahrenheit; dew point 52 degrees Fahrenheit; and the altimeter was 30.11 inHg.

## WRECKAGE AND IMPACT INFORMATION

The wreckage was first viewed on scene at the Castlemont High School. The first point of contact was with the east wall of a two-story classroom building. Three black rubber transfers and a building trim color of turquoise were observed on the building wall.

About 25 feet north of the initial point of contact the airplane was found imbedded into the vertical glass wall of a high ceiling single story cafeteria building. The engine was found imbedded at the rooffline with half of the engine above the roof with two relatively undamaged propeller blades. The roof is estimated to be about 30 feet agl. One damaged propeller blade was imbedded into the roof structure. The propeller spinner was undamaged.

The fuselage with some attachment to the engine was hanging vertically with the rudder touching the ground. The right wing was severed at midspan with the outer panel on the roof and the inboard wing section still attached to the fuselage center section. The left wing was still attached to the spar carry through structure with heavy leading edge damage and commingling with a chain link fence gate.

According to on scene emergency service personnel, there was fuel venting or running from the airplane in a steady stream. The local fire department foamed the accident area.

## TESTS AND RESEARCH INFORMATION

The aircraft radios were taken to a Federal Aviation Administration (FAA) approved avionics repair station for examination of selected frequencies using electrical power.

1) King KX-155 communication: 122.7 (Unicom) standby frequency 135.5 Navigation: 113.9 (OSI VOR) standby 117.3 (SNS VOR)

2) King KX-155 communication: 122.8 (Unicom) standby frequency 127.8 Navigation: 113.7 (SFO atis) standby frequency 113.9 (OSI VOR)

3) King KN-64 DME (distance measuring equipment) (OSI VOR)

The King KT-76 transponder was found in the off position during the initial on-scene examination.

During the postaccident examination, the airplane's 24-volt battery voltage was measured to be near fully charged. The engine starter motor was functional tested successfully by motoring.

A preliminary examination of the engine and fuel system occurred on-scene and at the recovery yard. The engine was shipped to Teledyne Continental Motors, Mobile, Alabama, for a detailed examination. The results of the FAA witnessed examination are included in this report.

ADDITIONAL INFORMATION

On September 14, 1999, the wreckage was released to the pilot's insurance company representative.

According to the Alameda County medical examiner, the passenger was not wearing a seat belt or a shoulder harness. During the initial on scene investigation, the pilot's shoulder harness was found stowed in the overhead belt/harness holder.

Use your browsers "back" function to return to synopsis
Return to Query Page

NTSB Identification: MIA95LA065 . The docket is stored in the (offline) NTSB Imaging System.

Nonscheduled 14 CFR Part 135: Air Taxi & Commuter

Accident occurred Saturday, January 28, 1995 in MIAMI, FL

Probable Cause Approval Date: 5/9/95

Aircraft: BELL 206-B3, registration: N5008N

Injuries: 3 Uninjured.

THE PILOT STATED THAT DURING CRUISE FLIGHT, ABOUT 800 FT OVER A FOOTBALL STADIUM, THE ENGINE LOST POWER. HE INITIATED AN AUTOROTATION AND APPLIED COLLECTIVE PITCH EARLY TO AVOID WIRES. tHE HELICOPTER THEEN LANDED HARD DAMAGING THE BELLY AND THE TRANSMISSION MOUNTS. EXAMINATION OF THE ENGINE REVEALED THAT THE COMPRESSOR DISCHARGE LINE [PC] WAS LOOSE AT THE FUEL CONTROL.

The National Transportation Safety Board determines the probable cause(s) of this accident as follows:

INADEQUATE MAINTENANCE AND INSPECTION, AND A LOOSE FUEL PC LINE. THE WIRES WERE A FACTOR WHICH NECESSITATED EARLY COLLECTIVE PITCH.

Full narrative available

Index for Jan1995 | Index of months

## AIRCRAFT ACCIDENT/INCIDENT PRELIMINARY NOTICE - FORM 8020-9

------------------------------------------------------------------
### A. INFORMATION FROM     DATE ENTERED: 00/00/0000

NOTICE FROM:

NOTICE TYPE: A     MID AIR COLLISION: N     MISSING: N
------------------------------------------------------------------
### B. AIRCRAFT INFORMATION

1. REGIS. NO: 88223

2. MAKE/MODEL:     2A. DESC: 7GCAA     2B. CATEGORY:

3. OPERATOR OF AIRCRAFT: GERALD W. WEST & GARY'S BAI

4. ACTIVITY TYPE: Unknown     PHASE: Other     GA/AIR CARRIER:

5. OCCURRENCE DESCRIPTION:

------------------------------------------------------------------
6. WEATHER: LUK  1620 EDT  90  87/68/1610/298

7. DAMAGE: Substantial
------------------------------------------------------------------
### C. PILOT INFORMATION

FIRST NAME: PATRICK     MI: L     LAST NAME: TUCKEY

STREET: 1908 LORRAINE     CITY: ANN ARBOR

STATE: MI     ZIP:     PHONE: ( )  -
------------------------------------------------------------------
### C2. CREW AND INJURY INFORMATION

| | | | |
|---|---|---|---|
| NUMBER CREW: 0 | CREW FATAL: 0 | CREW SERIOUS: 0 | CREW MINOR: 1 |
| NUMBER PASS: 0 | PASS FATAL: 0 | PASS SERIOUS: 0 | PASS MINOR: 0 |
| GROUND INJURIES | GRND FATAL: 0 | GRND SERIOUS: 0 | GRND MINOR: 0 |

------------------------------------------------------------------
D. ACCIDENT LOCATION   CITY: DAYTON     STATE: KY

E. DATE OF OCCURRENCE: 9/4/1983     UCT TIME OF OCCURRENCE: 16:20
------------------------------------------------------------------
F. INVESTIGATOR NAME:     REGION/DO:

DO CITY:     DO STATE:

OTHER INVESTIGATOR:
------------------------------------------------------------------
### G. FAA AIR TRAFFIC SERVICES SUMMARY OF FLIGHT HANDLING

1A. DEPARTURE POINT:     1B. DEPARTURE DATE:

UCT DEPARTURE TIME: 15:45     1C. FLIGHT DESTINATION:
------------------------------------------------------------------
2A. LAST RADIO CONTACT POINT:     4A. FLIGHT PLAN: NONE

3A. LAST ATC CONTROL CLEARANCE:     5A. PILOT BRIEFING:

6A. OTHER:
------------------------------------------------------------------
AAI100 INVESTIGATOR:

INITIALS:

DEFENDANT'S EXHIBIT
6

ATL83LA353

NTSB Identification: ATL83LA353 . The docket is stored on NTSB microfiche number 22924.

14 CFR Part 91: General Aviation

Accident occurred Sunday, September 04, 1983 in DAYTON, KY

Aircraft: Bellanca 7GCAA, registration: N8223

Injuries: 1 Minor.

THE ACFT WAS MODIFIED TO TOW BANNERS & WAS BEING USED FOR THAT PURPOSE. AFTER THE ACFT HAD BEEN FLOWN ABOUT 3 HRS & 20 MIN, THE PLT TOOK OFF ON HIS 4TH BANNER TOW FLT. HE STATED THAT HE HAD USED THE FUEL GAGES TO ESTIMATE THE AMOUNT OF FUEL REMAINING. THE ESTIMATED THAT 5 OR MORE GAL OF FUEL WAS ON BOARD PRIOR TO HIS LAST TAKEOFF. HE FLEW TO A STADIUM WHERE HE MADE 6 TO 8 TURNS. HE HAD JUST STARTED BACK TO THE ARPT WHEN THE ENG LOST POWER. FOLLOWING THE LOSS OF POWER, HE REPORTEDLY USED AN AIRSPEED OF 60 MPH. THE OWNER'S MANUAL RECOMMENDED A MINIMUM SPEED OF 65 MPH FOR A ATTEMPTING A RESTART. SUBSEQUENTLY, HE RELEASED THE BANNER JUST PRIOR TO DITCHING IN A RIVER. THE ACFT WAS TOWED TO THE RIVER BANK BY A BOAT & WAS RECOVERED LATER. APRX 2 GAL OF FUEL WAS FOUND REMAINING IN THE FUEL TANKS. NO PREIMPACT/MECHANICL FAILURES WERE FOUND.

The National Transportation Safety Board determines the probable cause(s) of this accident as follows:

FLUID,FUEL.EXHAUSTION
AIRCRAFT PREFLIGHT..INADEQUATE..PILOT IN COMMAND

Index for Sep1983 | Index of months

AIRCRAFT ACCIDENT/INCIDENT PRELIMINARY NOTICE - FORM 8020-9
--------------------------------------------------------------------
A. INFORMATION FROM      DATE ENTERED: 01/16/1996

NOTICE FROM: EASTERN REGION OPERATIONS CENTER

NOTICE TYPE: I        MID AIR COLLISION: N    MISSING: N
--------------------------------------------------------------------
B. AIRCRAFT INFORMATION

1. REGIS. NO: UNKN

2. MAKE/MODEL: UNKN    2A. DESC:                    2B. CATEGORY: Other Fixed Wing

3. OPERATOR OF AIRCRAFT: UNKN

4. ACTIVITY TYPE: Other          PHASE: Cruise    GA/AIR CARRIER: General Aviation

5. OCCURRENCE DESCRIPTION:
   AN UNIDENTIFIED BANNER TOWING ACFT OF UNKNOWN TYPE DROPPED ITS BANNER, THE
   BANNER LANDED IN A RESIDENTIAL AREA ON A CITIZEN'S ROOFTOP DAMAGING THE ROOF
   AND POWER LINES, IT WAS UNDETERMINED AT THE TIME OF THE INCIDENT WHERE THE
   ACFT WAS BASED, PITTSBURG, PA.


--------------------------------------------------------------------
6. WEATHER: UNKN

7. DAMAGE: None
--------------------------------------------------------------------
C. PILOT INFORMATION

FIRST NAME: UNKN              MI:    LAST NAME:

STREET:                              CITY:

STATE:        ZIP:              PHONE: (   )   -
--------------------------------------------------------------------
C2. CREW AND INJURY INFORMATION

NUMBER CREW:  1    CREW FATAL:  0    CREW SERIOUS:  0    CREW MINOR:  0

NUMBER PASS:  0    PASS FATAL:  0    PASS SERIOUS:  0    PASS MINOR:  0

GROUND INJURIES    GRND FATAL:  0    GRND SERIOUS:  0    GRND MINOR:  0
--------------------------------------------------------------------
D. ACCIDENT LOCATION   CITY: PITTSBURGH              STATE: PA

E. DATE OF OCCURRENCE: 1/14/1996        UCT TIME OF OCCURRENCE: 18:30
--------------------------------------------------------------------
F. INVESTIGATOR NAME:                      REGION/DO: EAJ9

   DO CITY: PITTSBURGH              DO STATE: PA

   OTHER INVESTIGATOR:
--------------------------------------------------------------------
G. FAA AIR TRAFFIC SERVICES SUMMARY OF FLIGHT HANDLING

1A. DEPARTURE POINT: UNKN          1B. DEPARTURE DATE:

UCT DEPARTURE TIME:              1C. FLIGHT DESTINATION: UNKN
--------------------------------------------------------------------
2A. LAST RADIO CONTACT POINT:      4A. FLIGHT PLAN:
    UNKN

3A. LAST ATC CONTROL CLEARANCE:    5A. PILOT BRIEFING:
    UNKN

6A. OTHER:
--------------------------------------------------------------------
AA1100 INVESTIGATOR:
INITIALS: HLM


DEFENDANT'S EXHIBIT
7